Patrick TOOLEY and Kevin Lewis, Plaintiffs Below, Appellants,

v.

DONALDSON, LUFKIN, & JENRETTE, INC., John Steele Chalsty, Henri De Castries, Michael Hegarty, Edward D. Miller, Stanley B. Tulin, Denis Duverne, Henri G. Hottinguer, W. Edwin Jarmain, Joe L. Roby, Hamilton E. James, Anthony F. Daddino, David F. DeLucia, Stuart M. Robbins, Francis Jungers, W.J. Sanders III, Louis Harris, Jane Mack Gould and John C. West, Defendants Below, Appellees.

No. 84,2003.

Supreme Court of Delaware.

Submitted: Sept. 23, 2003.
Decided: April 2, 2004.

Joseph A. Rosenthal, and Herbert W. Mondros, Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, DE; Arthur N. Abby (argued), of Abbey Gardy, LLP, New York City; Schiffrin & Barroway, LLP, Bala Cynwyd, PA, of counsel, for Appellants.

Robert K. Payson, and Donald J. Wolfe, Jr., of Potter Anderson & Corroon, Wilmington, DE; David C. McBride (argued), and John J. Paschetto, of Young Conaway Stargatt & Taylor, LLP, Wilmington, DE; Paul K. Rowe, of Wachtell, Lipton, Rosen & Katz, New York City; Alan S. Goudiss, of Sherman & Sterling, New York City, of counsel, for Appellees.

Before VEASEY, Chief Justice, HOLLAND, BERGER, STEELE and JACOBS, Justices, constituting the Court en Banc.

VEASEY, Chief Justice:

Plaintiff-stockholders brought a purported class action in the Court of Chancery, alleging that the members of the board of directors of their corporation breached their fiduciary duties by agreeing to a 22–day delay in closing a proposed merger. Plaintiffs contend that the delay harmed them due to the lost time-value of the cash paid for their shares. The Court of Chancery granted the defendants' motion to dismiss on the sole ground that the claims were, "at most," claims of the corporation being asserted derivatively. They were, thus, held not to be direct claims of the stockholders, individually. Thereupon, the Court held that the plaintiffs lost their standing to bring this action when they tendered their shares in connection with the merger.

■ Although the trial court's legal analysis of whether the complaint alleges a direct or derivative claim reflects some concepts in our prior jurisprudence, we believe those concepts are not helpful and should be regarded as erroneous. We set forth in this Opinion the law to be applied henceforth in determining whether a stockholder's claim is derivative or direct. That issue must turn *solely* on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?

To the extent we have concluded that the trial court's analysis of the direct vs. derivative dichotomy should be regarded as erroneous, we view the error as harmless in this case because the complaint does not set forth *any* claim upon which relief can be granted. In its opinion, the Court of Chancery properly found on the facts pleaded that the plaintiffs have no separate contractual right to the alleged lost time-value of money arising out of extensions in the closing of a tender offer. These extensions were made in connection with a merger where the plaintiffs' right to any payment of the merger consideration had not ripened at the time the extensions were granted. No other individual right of these stockholders having been asserted in the complaint, it was correctly dismissed.

In affirming the judgment of the trial court as having correctly dismissed the complaint, we reverse only its dismissal with prejudice.[1] We remand this action to the Court of Chancery with directions to amend its order of dismissal to provide that: (a) the action is dismissed for failure to state a claim upon which relief can be granted; and (b) that the dismissal is without prejudice. Thus, plaintiffs will have an opportunity to replead, if warranted under Court of Chancery Rule 11.

### Facts

Patrick Tooley and Kevin Lewis are former minority stockholders of Donaldson, Lufkin & Jenrette, Inc. (DLJ), a Delaware corporation engaged in investment banking. DLJ was acquired by Credit Suisse Group (Credit Suisse) in the Fall of 2000. Before that acquisition, AXA Financial, Inc.(AXA), which owned 71% of DLJ stock, controlled DLJ. Pursuant to a stockholder agreement between AXA and Credit Suisse, AXA agreed to exchange with Credit Suisse its DLJ stockholdings for a mix of stock and cash. The consideration

---

1. Since the order of dismissal here did not state that it was without prejudice, it is deemed to operate as an adjudication upon the merits. *See* Court of Chancery Rule 41(b)(2).

**1034**

received by AXA consisted primarily of stock. Cash made up one-third of the purchase price. Credit Suisse intended to acquire the remaining minority interests of publicly-held DLJ stock through a cash tender offer, followed by a merger of DLJ into a Credit Suisse subsidiary.

The tender offer price was set at $90 per share in cash. The tender offer was to expire 20 days after its commencement. The merger agreement, however, authorized two types of extensions. First, Credit Suisse could unilaterally extend the tender offer if certain conditions were not met, such as SEC regulatory approvals or certain payment obligations. Alternatively, DLJ and Credit Suisse could agree to postpone acceptance by Credit Suisse of DLJ stock tendered by the minority stockholders.

Credit Suisse availed itself of both types of extensions to postpone the closing of the tender offer. The tender offer was initially set to expire on October 5, 2000, but Credit Suisse invoked the five-day unilateral extension provided in the agreement. Later, by agreement between DLJ and Credit Suisse, it postponed the merger a second time so that it was then set to close on November 2, 2000.

Plaintiffs challenge the second extension that resulted in a 22–day delay. They contend that this delay was not properly authorized and harmed minority stockholders while improperly benefitting AXA. They claim damages representing the time-value of money lost through the delay.

### The Decision of the Court of Chancery

The order of the Court of Chancery dismissing the complaint, and the Memorandum Opinion upon which it is based,[2] state that the dismissal is based on the

plaintiffs' lack of standing to bring the claims asserted therein. Thus, when plaintiffs tendered their shares, they lost standing under Court of Chancery Rule 23.1, the contemporaneous holding rule. The ruling before us on appeal is that the plaintiffs' claim is derivative, purportedly brought on behalf of DLJ. The Court of Chancery, relying upon our confusing jurisprudence on the direct/derivative dichotomy, based its dismissal on the following ground: "Because this delay affected all DLJ shareholders equally, plaintiffs' injury was not a special injury, and this action is, thus, a derivative action, at most." [3]

■ Plaintiffs argue that they have suffered a "special injury" because they had an alleged contractual right to receive the merger consideration of $90 per share without suffering the 22–day delay arising out of the extensions under the merger agreement. But the trial court's opinion convincingly demonstrates that plaintiffs had no such contractual right that had ripened at the time the extensions were entered into:

> Here, it is clear that plaintiffs have no separate contractual right to bring a direct claim, and they do not assert contractual rights under the merger agreement. First, the merger agreement specifically disclaims any persons as being third party beneficiaries to the contract. Second, any contractual shareholder right to payment of the merger consideration did not ripen until the conditions of the agreement were met. The agreement stated that Credit Suisse Group was not required to accept any shares for tender, or could extend the offer, under certain conditions—one condition of which included an extension or termination by agreement between

**2.** *Tooley v. Donaldson Lufkin and Jenrette*, No. Civ. A. 18414–NC, 2003 WL 203060 (Del.Ch. Jan. 21, 2003).

**3.** *Id.* at *4.

Credit Suisse Group and DLJ. *Because Credit Suisse Group and DLJ did in fact agree to extend the tender offer period, any right to payment plaintiffs could have did not ripen until this newly negotiated period was over. The merger agreement only became binding and mutually enforceable at the time the tendered shares ultimately were accepted for payment by Credit Suisse Group.* It is at that moment in time, November 3, 2000, that the company became bound to purchase the tendered shares, making the contract mutually enforceable. *DLJ stockholders had no individual contractual right to payment until November 3, 2000, when their tendered shares were accepted for payment.* Thus, they have no contractual basis to challenge a delay in the closing of the tender offer up until November 3. *Because this is the date the tendered shares were accepted for payment, the contract was not breached and plaintiffs do not have a contractual basis to bring a direct suit.*[4]

Moreover, no other individual right of these stockholder-plaintiffs was alleged to have been violated by the extensions.

That conclusion could have ended the case because it portended a definitive ruling that plaintiffs have no claim whatsoever on the facts alleged. But the defendants chose to argue, and the trial court chose to decide, the standing issue, which is predicated on an assertion that this claim is a derivative one asserted on behalf of the corporation, DLJ.

The Court of Chancery correctly noted that "[t]he Court will independently examine the nature of the wrong alleged and any potential relief to make its own determination of the suit's classification. . . .

Plaintiffs' classification of the suit is not binding."[5] The trial court's analysis was hindered, however, because it focused on the confusing concept of "special injury" as the test for determining whether a claim is derivative or direct. The trial court's premise was as follows:

In order to bring a *direct* claim, a plaintiff must have experienced some "special injury." [citing *Lipton v. News Int'l*, 514 A.2d 1075, 1079 (Del.1986)]. A special injury is a wrong that "is separate and distinct from that suffered by other shareholders, . . . or a wrong involving a contractual right of a shareholder, such as the right to vote, or to assert majority control, which exists independently of any right of the corporation." [citing *Moran v. Household Int'l. Inc.*, 490 A.2d 1059, 1070 (Del.Ch.1985), *aff'd* 500 A.2d 1346 (Del.1986 [1985])].[6]

In our view, the concept of "special injury" that appears in some Supreme Court and Court of Chancery cases is not helpful to a proper analytical distinction between direct and derivative actions. We now disapprove the use of the concept of "special injury" as a tool in that analysis.

### *The Proper Analysis to Distinguish Between Direct and Derivative Actions*

The analysis must be based solely on the following questions: Who suffered the alleged harm—the corporation or the suing stockholder individually—and who would receive the benefit of the recovery or other remedy? This simple analysis is well imbedded in our jurisprudence,[7] but some cases have complicated it by injection of the amorphous and confusing concept of "special injury."

---

**4.** *Id.* at *3 (footnotes omitted (emphasis added)).

**5.** *Id.*

**6.** *Id.*

**7.** *See, e.g., Kramer v. Western Pacific Industries, Inc.,* 546 A.2d 348 (Del.1988).

The Chancellor, in the very recent *Agostino* case,[8] correctly points this out and strongly suggests that we should disavow the concept of "special injury." In a scholarly analysis of this area of the law, he also suggests that the inquiry should be whether the stockholder has demonstrated that he or she has suffered an injury that is not dependent on an injury to the corporation. In the context of a claim for breach of fiduciary duty, the Chancellor articulated the inquiry as follows: "Looking at the body of the complaint and considering the nature of the wrong alleged and the relief requested, has the plaintiff demonstrated that he or she can prevail without showing an injury to the corporation?"[9] We believe that this approach is helpful in analyzing the first prong of the analysis: what person or entity has suffered the alleged harm? The second prong of the analysis should logically follow.

### A Brief History of Our Jurisprudence

■■ The derivative suit has been generally described as "one of the most interesting and ingenious of accountability mechanisms for large formal organizations."[10] It enables a stockholder to bring suit on behalf of the corporation for harm done to the corporation.[11] Because a derivative suit is being brought on behalf of the corporation, the recovery, if any, must go to the corporation. A stockholder who is directly injured, however, does retain the right to bring an individual action for injuries affecting his or her legal rights as a stockholder. Such a claim is distinct from an injury caused to the corporation alone. In such individual suits, the recovery or other relief flows directly to the stockholders, not to the corporation.

■ Determining whether an action is derivative or direct is sometimes difficult and has many legal consequences, some of which may have an expensive impact on the parties to the action.[12] For example, if an action is derivative, the plaintiffs are then required to comply with the requirements of Court of Chancery Rule 23.1, that the stockholder: (a) retain ownership of the shares throughout the litigation; (b) make presuit demand on the board; and (c) obtain court approval of any settlement. Further, the recovery, if any, flows only to the corporation. The decision whether a suit is direct or derivative may be outcome-determinative. Therefore, it is necessary that a standard to distinguish such actions be clear, simple and consistently articulated and applied by our courts.

In *Elster v. American Airlines, Inc.,*[13] the stockholder sought to enjoin the grant and exercise of stock options because they

8. *Agostino v. Hicks,* No. Civ. A. 20020–NC, 2004 WL 443987 (Del.Ch. March 11, 2004).

9. *Agostino,* 2004 WL 443987, at *7. The Chancellor further explains that the focus should be on the person or entity to whom the relevant duty is owed. *Id.* at *7 n. 54. As noted in *Agostino, id.,* this test is similar to that articulated by the American Law Institute (ALI), a test that we cited with approval in *Grimes v. Donald,* 673 A.2d 1207 (Del. 1996). The ALI test is as follows:

A direct action may be brought in the name and right of a holder to redress an injury sustained by, or enforce a duty owed to, the holder. An action in which the holder can prevail without showing an injury or breach of duty to the corporation should be treated as a direct action that may be maintained by the holder in an individual capacity. 2. American Law Institute, PRINCIPLES OF CORPORATE GOVERNANCE: ANALYSIS AND RECOMMENDATIONS § 7.01(b) at 17.

10. *Kramer v. Western Pacific Industries, Inc.,* 546 A.2d at 351 (quoting R. Clark, *Corporate Law* 639–40 (1986)).

11. *Id.*

12. *Grimes v. Donald,* 673 A.2d at 1213 (Del. 1996).

13. 100 A.2d 219, 222 (Del.Ch.1953).

would result in a dilution of her stock personally. In *Elster*, the alleged injury was found to be derivative, not direct, because it was essentially a claim of mismanagement of corporate assets. Then came the complication in the analysis: The Court held that where the alleged injury is to both the corporation *and* to the stockholder, the stockholder must allege a "special injury" to maintain a direct action. The Court did not define "special injury," however. By implication, decisions in later cases have interpreted *Elster* to mean that a "special injury" is alleged where the wrong is inflicted upon the stockholder alone or where the stockholder complains of a wrong affecting a particular right. Examples would be a preemptive right as a stockholder, rights involving control of the corporation or a wrong affecting the stockholder, qua individual holder, and not the corporation.[14]

In *Bokat v. Getty Oil Co.,*[15] a stockholder of a subsidiary brought suit against the director of the parent corporation for causing the subsidiary to invest its resources wastefully, resulting in a loss to the subsidiary.[16] The claim in *Bokat* was essentially for mismanagement of corporate assets. Therefore, the Court held that any recovery must be sought on behalf of the corporation, and the claim was, thus, found to be derivative.

In describing how a court may distinguish direct and derivative actions, the *Bokat* Court stated that a suit must be maintained derivatively if the injury falls equally upon all stockholders. Experience has shown this concept to be confusing and inaccurate. It is confusing because it ap-

pears to have been intended to address the fact that an injury to the corporation tends to diminish each share of stock equally because corporate assets or their value are diminished. In that sense, the *indirect* injury to the stockholders arising out of the harm to the corporation comes about solely by virtue of their stockholdings. It does not arise out of any independent or direct harm to the stockholders, individually. That concept is also inaccurate because a direct, individual claim of stockholders that does not depend on harm to the corporation can also fall on all stockholders equally, without the claim thereby becoming a derivative claim.

In *Lipton v. News International, Plc.,*[17] this Court applied the "special injury" test. There, a stockholder began acquiring shares in the defendant corporation presumably to gain control of the corporation. In response, the defendant corporation agreed to an exchange of its shares with a friendly buyer. Due to the exchange and a supermajority voting requirement on certain stockholder actions, the management of the defendant corporation acquired a veto power over any change in management.

The *Lipton* Court concluded that the critical analytical issue in distinguishing direct and derivative actions is whether a "special injury" has been alleged. There, the Court found a "special injury" because the board's manipulation worked an injury upon the plaintiff-stockholder unlike the injury suffered by other stockholders. That was because the plaintiff-stockholder was actively seeking to gain control of the

---

**14.** See *Lipton v. News International, Plc.,* 514 A.2d 1075, 1078 (Del.1986); *Moran v. Household International Inc.,* 490 A.2d 1059, 1069–70 (Del.Ch.1985) (to distinguish a direct and derivative action, injury must be separate and distinct from that suffered by other stockholders or involve a contractual right independent of the corporation).

**15.** 262 A.2d 246 (Del.1970).

**16.** *Id.* at 249.

**17.** *Lipton,* 514 A.2d at 1078.

defendant corporation.[18] Therefore, the Court found that the claim was direct. Ironically, the Court could have reached the same correct result by simply concluding that the manipulation directly and individually harmed the stockholders, without injuring the corporation.

In *Kramer v. Western Pacific Industries, Inc.,*[19] this Court found to be derivative a stockholder's challenge to corporate transactions that occurred six months immediately preceding a buy-out merger. The stockholders challenged the decision by the board of directors to grant stock options and golden parachutes to management. The stockholders argued that the claim was direct because their share of the proceeds from the buy-out sale was reduced by the resources used to pay for the options and golden parachutes. Once again, our analysis was that to bring a direct action, the stockholder must allege something other than an injury resulting from a wrong to the corporation. We interpreted *Elster* to require the court to determine the nature of the action based on the "nature of the wrong alleged" and the relief that could result.[20] That was, and is, the correct test. The claim in *Kramer* was essentially for mismanagement of corporate assets. Therefore, we found the claims to be derivative. That was the correct outcome.[21]

In *Grimes v. Donald,*[22] we sought to distinguish between direct and derivative actions in the context of employment agreements granted to certain officers that allegedly caused the board to abdicate its authority. Relying on the *Elster* and *Kramer* precedents that the court must look to the nature of the wrong and to whom the relief will go,[23] we concluded that the plaintiff was not seeking to recover any damages for injury to the corporation. Rather, the plaintiff was seeking a declaration of the invalidity of the agreements on the ground that the board had abdicated its responsibility to the stockholders.[24] Thus, based on the relief requested, we affirmed the judgment of the Court of Chancery that the plaintiff was entitled to pursue a direct action.

*Grimes* was followed by *Parnes v. Bally Entertainment Corp.*, which held, among other things, that the injury to the stockholders must be "independent of any injury to the corporation."[25] As the Chancellor correctly noted in *Agostino*, neither *Grimes* nor *Parnes* applies the purported "special injury" test.[26]

■ Thus, two confusing propositions have encumbered our caselaw governing the direct/derivative distinction. The "special injury" concept, applied in cases such as *Lipton*, can be confusing in identifying the nature of the action. The same is true of the proposition that stems from *Bokat*—that an action cannot be direct if all stockholders are equally affected or unless the

---

**18.** *Id.*

**19.** 546 A.2d 348, 352 (Del.1988).

**20.** *Id.*

**21.** In the *Tri–Star* case, however, this Court lapsed back into the "special injury" concept, which we now discard. *In re Tri–Star Pictures, Inc. Litigation,* 634 A.2d 319, 330 (1993).

**22.** 673 A.2d 1207, 1213 (Del.1996).

**23.** *Elster,* 100 A.2d at 221–23; *Kramer,* 546 A.2d at 351. *See also* John W. Welch, *Shareholder Individual and Derivative Actions: Underlying Rationales and the Closely Held Corporation,* 9 J. Corp. L. 147, 160 (1984) (stating that courts should analyze the rights involved to determine whether the action is direct or derivative).

**24.** *Grimes,* 673 A.2d at 1213.

**25.** 722 A.2d 1243, 1245 (Del.1999).

**26.** *Agostino,* 2004 WL 443987, at *6 n. 49.

stockholder's injury is separate and distinct from that suffered by other stockholders. The proper analysis has been and should remain that stated in *Grimes*; *Kramer* and *Parnes*. That is, a court should look to the nature of the wrong and to whom the relief should go. The stockholder's claimed direct injury must be independent of any alleged injury to the corporation. The stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation.

### Standard to Be Applied in This Case

■ In this case it cannot be concluded that the complaint alleges a derivative claim. There is no derivative claim asserting injury to the corporate entity. There is no relief that would go the corporation. Accordingly, there is no basis to hold that the complaint states a derivative claim.

But, it does not necessarily follow that the complaint states a direct, individual claim. While the complaint purports to set forth a direct claim, in reality, it states no claim at all. The trial court analyzed the complaint and correctly concluded that it does not claim that the plaintiffs have any rights that have been injured.[27] Their rights have not yet ripened. The contractual claim is nonexistent until it is ripe, and that claim will not be ripe until the terms of the merger are fulfilled, including the extensions of the closing at issue here. Therefore, there is no direct claim stated in the complaint before us.

Accordingly, the complaint was properly dismissed. But, due to the reliance on the concept of "special injury" by the Court of Chancery, the ground set forth for the dismissal is erroneous, there being no derivative claim. That error is harmless, however, because, in our view, there is no direct claim either.

### Conclusion

For purposes of distinguishing between derivative and direct claims, we expressly disapprove both the concept of "special injury" and the concept that a claim is necessarily derivative if it affects all stockholders equally. In our view, the tests going forward should rest on those set forth in this opinion.

We affirm the judgment of the Court of Chancery dismissing the complaint, although on a different ground from that decided by the Court of Chancery. We reverse the dismissal with prejudice and remand this matter to the Court of Chancery to amend the order of dismissal: (a) to state that the complaint is dismissed on the ground that it does not state a claim upon which relief can be granted; and (b) that the dismissal is without prejudice.

Because our determination that there is no valid claim whatsoever in the complaint before us was not argued[28] by the defendants and was not the basis of the ruling of the Court of Chancery,[29] the interests of justice will be best served if the dismissal is without prejudice, and plaintiffs have an opportunity to replead if they have a basis

---

27. *Tooley*, 2003 WL 203060, at *3.

28. As we have noted, the opinion of the trial court clearly stated that plaintiffs did not have a contractual right that had ripened. *Tooley*, 2003 WL 203060, at *3. On appeal, appellees cited twice to the trial court's conclusion that there was no contractual right, but it was in the context of the derivative/direct claim issue. (Appellees' Answering Brief at pp. 3,

17–18). On appeal, plaintiffs-appellants do not challenge the trial court's finding. Moreover, inexplicably, plaintiffs-appellants filed no reply brief in this Court.

29. See, *Unitrin, Inc. v. American General Corp.*, 651 A.2d 1361, 1390 (Del.1995) (decision of Supreme Court reversing trial court based on different grounds than that argued on appeal).

for doing so under Court of Chancery Rule 11. This result—permitting plaintiffs to replead—is unusual, but not unprecedented.[30]

It is ordered that the time within which a motion for reargument may be timely filed under Supreme Court Rule 18 is shortened to five days from the date of this opinion. This is due to the impending change in the composition of the Supreme Court, arising from the retirement of the Chief Justice in April 2004.

---

**30.** *Compare Brehm v. Eisner,* 746 A.2d 244, 267 (Del.1999) (permitting plaintiffs to proceed because of the unique circumstances noted there), with *White v. Panic,* 783 A.2d 543, 556 (Del.2001) (declining to permit plaintiffs to replead, there being no circumstances justifying such action).