Kosti SHIRVANIAN, Kosti Shirvanian and Marian Shirvanian in their Capacities as Trustees of Kosti Shirvanian and Marian Shirvanian Family Trust, and Ralph Tufenkian and Savey Tufenkian in their Capacities as Trustees of Tufenkian Family Trust, Appellants,

v.

Earl E. DeFRATES, Rodney Proto, and Waste Management, Inc., Appellees.

No. 14–02–00447–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Nov. 18, 2004.

Rehearing Overruled March 31, 2005.

Steven R. Rech, Daryl L. Moore, Sharon McCally, Houston, Pamela Stanton Baron, Austin, for appellants.

D. Gibson Walton, Gwen J. Samora, Marie R. Yeates, Richard P. Hogan, Jr., Stephen Burton Crain, Houston, Rodney Acker, Dallas & Houston, David E. Keltner, Fort Worth, for appellees.

Panel consists of Justice FOWLER and Justice HUDSON.

## OPINION ON REHEARING

WANDA McKEE FOWLER, Justice.

We originally issued an opinion on January 8, 2004 in favor of the appellants, the Shirvanians, holding that the suit they brought against the appellees was a direct action—not a derivative suit—and therefore not barred by an earlier derivative suit against appellees. That decision applied Delaware law. However, while the appeal was on motion for rehearing, the Delaware Supreme Court issued an opinion clarifying when a suit is derivative in that state. *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del.2004). Based on the direction given by that opinion, we grant appellees' motion for rehearing. The opinion issued January 8, 2004 is withdrawn and the following opinion is issued in its place.

### Procedural Posture of the Appeal

Appellants Kosti Shirvanian and various family trusts ("Shirvanians"), formerly the largest non-institutional shareholders of Waste Management, Inc., brought suit against appellees Waste Management, and former chief executives of Waste Management,[1] Earl E. DeFrates and Rodney Proto ("Waste Management Group"). The Shirvanians asserted claims of fraud, intentional misrepresentation, negligent and grossly-negligent misrepresentation, and conspiracy, alleging that Proto and DeF-

rates induced Kosti Shirvanian and his sister, Savey Tufenkian, not to follow through with their plans to sell 3 million shares of Waste Management stock. The trial court granted appellees' motion for summary judgment and sustained appellees' special exceptions without specifying the basis for its rulings. Finding that the lawsuit the Shirvanians bring is derivative in nature and barred by res judicata, we affirm.

### Standards of Review

After the Shirvanians sued them, appellees moved for summary judgment as an alternative to their special exceptions. The trial court entered one order in which it sustained the special exceptions and granted summary judgment and dismissed the case with prejudice, and the court later entered a final judgment. Ordinarily, we review a trial court's dismissal of a case upon special exceptions for an abuse of discretion. *Melendez v. Exxon Corp.*, 998 S.W.2d 266, 273 (Tex.App.-Houston [14th Dist.] 1999, no pet.). However, "[w]hen a trial court dismisses a case upon special exceptions for failure to state a cause of action, we review that issue of law under a *de novo* standard." *Boales v. Brighton Builders, Inc.*, 29 S.W.3d 159, 163 (Tex. App.-Houston [14th Dist.] 2000, pet. denied). We must accept as true all material factual allegations and all factual statements reasonably inferred from the allegations set forth in the appellants' pleadings. *Id.* (citing *Sorokolit v. Rhodes*, 889 S.W.2d 239, 240 (Tex.1994)).

Appellees filed a traditional motion for summary judgment, and therefore had the burden to show that no genuine issue of material fact exists and that they are enti-

---

1. One defendant, Gregory T. Sangalis, former general counsel of Waste Management, was nonsuited.

tled to judgment as a matter of law. Tex.R. Civ. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex.1985). As defendants, they must conclusively negate at least one essential element of each of the Shirvanians' causes of action or conclusively establish each element of an affirmative defense. *Science Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997). The appellees' summary judgment motion rested solely on their affirmative defenses. In deciding whether a disputed material fact issue exists precluding summary judgment on appellees' affirmative defenses, we resolve every reasonable inference in favor of the Shirvanians and take all evidence favorable to them as true. *Id.* at 911. Because the trial court's order does not specify the grounds upon which it relied in granting appellees' motion, we will uphold the judgment if it is properly supported on any ground by competent summary judgment evidence. *Star–Telegram, Inc. v. Doe*, 915 S.W.2d 471, 473 (Tex.1995).

## Relevant Factual Background

Waste Management's shares are publicly traded. As of January, 1999, the Shirvanians owned over 6.1 million shares of Waste Management stock, representing approximately 9.5% of all then-issued shares of Waste Management stock. They also owned options to purchase an additional 4 million shares. During the time period relevant to this lawsuit, Shirvanian and his sister, along with the family trusts named above, were the largest non-institutional investors in Waste Management. Shirvanian was Waste Management's single largest shareholder. Waste Management had acquired USA Waste Services, Inc., which had previously acquired Shirvanian's company, Western Waste, Inc. Both Shirvanian and Tufenkian had sat on the board of directors of USA Waste Services.

Shirvanian alleges that he decided, with the advice of financial advisors and other professionals, to diversify his stock holdings and sell shares of Waste Management, but he could not do so until 1999 because his shares were restricted. In the interim, he borrowed against his Waste Management shares and invested in other stocks, thereby incurring margin debt in excess of $100 million. After consulting with five accounting firms, he and his advisers planned to sell between 2.5 and 3 million shares of Waste Management at a rate of 50,000 to 100,000 shares per day between mid-April or early May and late June of 1999, after the sale restrictions were removed. Tufenkian's trust planned to sell 20,000 shares per month during the same time frame. Tufenkian did not document her plan to sell Waste Management shares during this time period, and the parties dispute whether any writing reflects Tufenkian's intent to sell Waste Management shares. In any event, in January of 1999, Shirvanian sold approximately 150,000 of his shares at about $51.00 per share. He sold additional shares on four occasions in March, April, and May of 1999. Tufenkian sold 60,000 shares in increments of 20,000 before May of 1999.

In May, "out of a sense of 'professional duty,'" Shirvanian informed Proto, then president and chief operating officer of Waste Management, and DeFrates, then chief financial officer, of the Shirvanians' intent to sell Waste Management shares. Shirvanian testified that he called Proto to get advice as to whether he should sell his shares because he "was very involved with Waste Management." As he explained, "Stocks I buy from outside area, I'm, basically, not that close to the situation." In an effort to induce Shirvanian and Tufenkian not to sell their shares, Proto and DeFrates fraudulently misrepresented the financial well-being of Waste Management.

Shirvanian and Tufenkian said these misrepresentations were made during conversations between Shirvanian or Tufenkian, on the one hand, and Proto and DeFrates, on the other hand, (1) at a February 14, 1999 wedding reception, (2) during a telephone conversation between Shirvanian and Proto in May, (3) during a conversation between Shirvanian, Proto, and DeFrates at the Dallas, Texas airport, and (4) during at least two telephone conversations between Proto and Shirvanian after a drop in Waste Management's stock on July 7, 1999. Shirvanian relayed the content of his conversations with Proto and DeFrates to his sister. The specific alleged misrepresentations are as follows:

- Shirvanian called Proto in May of 1999 to tell him about his intent to sell shares because they "were friends ... knew each other ... [and Shirvanian] trusted him [Proto], and ... kindly took his advice...." Proto urged Shirvanian not to sell, saying that Waste Management "is sound," "do not sell your stock," and "hold your shares." He also said Waste Management's earnings were "great" and synergies were "great"; the stock would be "going to $70 per share"; and that management was "holding some things back" that he could not divulge to Shirvanian. Proto said Waste Management would "meet its earnings projections" for 1999; he anticipated no surprises; and no unfavorable financial circumstances were known or about to be revealed. Proto said he was not going to sell his Waste Management shares.

- In a telephone conversation with DeFrates, also in May, DeFrates told Shirvanian that Waste Management "will have a billion in cash flow next year," and Waste Management would have enough money to "choke a horse."

- Also in May, at the airport in Dallas, Texas, during a conversation between Shirvanian, Proto, and DeFrates, Proto said Waste Management was "doing great"; [e]verything was "OK"; and "Waste Management is going to make its numbers, ($3.30) for first quarter 1999 and year end 1999."

- In a telephone conversation with Proto around the first week of May or May 8 or 9, 1999, Tufenkian asked Proto how Waste Management was doing and if the company was going to make enough money so that she could continue her charitable work, and he said, "Yes."

- DeFrates and Proto said in separate conversations to Shirvanian, "I'm not selling my shares, and I don't think you should sell yours.... [I]f I was you, I would not sell my shares.... I would not get panicked.... If you can ... keep your margins, I would try to do it; and I'm doing the same thing. I'm trying to save whatever I have.... [T]he company is going to do well. Why do you want to sell your shares?" Proto and DeFrates told Shirvanian not to sell because it would "hurt the company" and "it won't look good for the company for Kosti to sell shares."

- DeFrates and Proto told Shirvanian that "[e]verything we say is true facts and you can depend on it; we are going to make our earnings; and we are going to make our earnings next year; and if I was you, I would not sell my shares."

- At a February 14, 1999 wedding reception, in response to Shirvanian's query as to whether Waste Management would split its stock if it went up, Proto assured Shirvanian, with Tufenkian present, that "[w]hen the stock goes to $60, we will split the stock and

Kosti is going to be a billionaire. He's going to make so much money, he wouldn't know what to do with it." Tufenkian's account of her conversation with Proto at the reception differs. She testified that Proto told her that Waste Management would "consider" splitting the stock if it went up.

- Proto told Shirvanian the "company was doing great." Proto made a "personal commitment" to Shirvanian: "The company was doing great; they are going to make their earnings." DeFrates and Proto told Shirvanian "there was no reason to worry about anything else." They told Shirvanian "[w]e are going to make the 3.05. No problem. We're going to make a billion dollars a year positive cash flow."

As a result of these many misrepresentations, the Shirvanians cancelled their plans to sell more Waste Management shares. In June of 1999, the Shirvanians possessed option rights to purchase up to 4 million additional shares of Waste Management stock; if not exercised by June 30, 1999, certain of the options would expire. Shirvanian exercised his options, purchasing 885,366 more shares of Waste Management stock. But, while the Shirvanians cancelled their plans to sell shares and even purchased more shares through options—all at the urging of DeFrates and Proto—DeFrates and Proto sold shares of Waste Management stock.

In July, Waste Management issued several press releases, including releases distributed on July 6, 1999, and July 29, 1999, in which the company announced that it would not meet its earnings projections and that previously announced earning expectations were wrong. On July 7, Waste Management's stock fell from $53.56 to below $33.94 per share, the largest one-day drop in share price in Waste Management's company history. During a tele-

phone conversation on July 8, Proto told Shirvanian: "We missed our projections," and the market "over reacted"; we don't know why the market "reacted so badly"; the "market was unfair"; the market is "punishing us for bad information." According to Shirvanian, Proto also made the following comments: (1) Waste Management's stock "should not have fallen below $45 per share" and that "everything is OK"; "all will be OK"; and Waste Management's stock value "will come back." (2) Waste Management will "absolutely make its numbers"; "we are sure." (3) There is "no more bad news"; everything is "behind us"; there will not be a "second shoe to fall." (4) Kosti should "not get panicky"; and "don't sell."

Sometime between July 9 and July 13, 1999, Shirvanian had another telephone conversation with Proto in which Proto said Waste Management had a "$45 value if liquidated today"; Waste Management stock "should go up to $50 per share"; things were "great"; and "I don't know of any more bad news." After the July 29 press release in which Waste Management further revised its earning projections downward, however, Waste Management's stock fell from $33 per share to $26 per share. All total, Waste Management's stock dropped from $59 per share to $24 per share during the summer of 1999.

In reliance on the above misrepresentations made by Proto and DeFrates, the Shirvanians lost the opportunity to sell their shares at a more favorable price and lost over $50 million. Shirvanian sold more than 3.5 million shares of Waste Management stock between July 9, 1999, and August 13, 1999, at an average price of $22 per share. Furthermore, the Shirvanians allege they lost over $32 million relating to the stock options they exercised, due in part to tax liability on Shirvanian's exercise of the options.

Because of the drop in Waste Management's stock value, derivative and shareholder class action lawsuits were commenced against Waste Management and some of its former executives, including DeFrates and Proto. Two derivative lawsuits brought in Delaware state court were consolidated in the case styled *In re Waste Management, Inc. Shareholders Derivative Litigation,* C.A. No. 17313NC. That litigation was settled and the settlement approved by the Delaware Court of Chancery on September 30, 2001.

The Shirvanians filed this lawsuit on January 4, 2000, asserting causes of action for fraud and intentional misrepresentation, negligent and grossly-negligent misrepresentation, conspiracy,[2] and damages. They seek to recover as damages the difference in the value of over 5 million shares of Waste Management stock before and after the July, 1999 decline in Waste Management's stock value.

Appellees filed special exceptions and a motion for summary judgment. The basis for appellees' special exceptions is that the Shirvanians failed to state a cause of action because Texas does not recognize a common-law cause of action for fraud for a "holder claim"—a claim that Proto and DeFrates induced the Shirvanians to "hold" their stock rather than sell it—and this court should adopt federal securities law to bar such a claim.[3] In their motion for summary judgment, appellees sought to prevail on any one of the following affirmative defenses:

(1) The Shirvanians lack capacity to sue because all of their claims can be brought only in the name of the corporation as a derivative action and none of the claims are personal to the Shirvanians.

(2) Because the Shirvanians seek to recover for an injury common to all Waste Management shareholders, the Shirvanians are improperly attempting to assert derivative claims barred under res judicata principles by the prior judgment entered by the Delaware court in the consolidated shareholder derivative lawsuit brought against Waste Management based on the decline of Waste Management's stock in July of 1999.

(3) The Shirvanians' claims are barred by the doctrines of unclean hands and unlawful acts because they (a) sought and attempted to trade on insider information from Proto and DeFrates and (b) allege they received fraudulent insider information.

(4) Even if their claims are direct claims, the Shirvanians' claims are barred under the doctrine of implied "conflict" preemption principles by federal securities laws that prohibit insider trading.

Appellees also argue on appeal that the trial court did not abuse its discretion in denying the Shirvanians' postjudgment motion for leave to amend to add a claim for overpayment of taxes predicated on

---

**2.** There is one alleged factual basis for the conspiracy claim, according to Shirvanian's testimony. He alleges that when Proto, DeFrates, and Sangalis were at a meeting in Mexico during the operative time frame, "they were conspiring and doing things that was not the best of the corporate—or my benefit or any shareholder's benefit."

**3.** This argument was the focus of appellees' combined special exceptions and motion for

summary judgment. On appeal, appellees no longer make this argument their focal point, and instead argue that this court should only reach this argument if we conclude summary judgment was not proper. We make this note because appellees chastise the Shirvanians for focusing on the special exceptions argument. Such a contention is without merit when it is appellees who have shifted their argument on appeal.

Shirvanian's exercise of his options to purchase Waste Management stock at below-market prices because the Shirvanians' original complaint did not plead such a claim, and it also is a "holder" claim that fails as a matter of law.

### Analysis

Though the parties cite extensive case-law, they concede that the Texas Supreme Court has not addressed the seminal questions presented by this appeal. This appeal presents us with an unusual procedural framework because the trial court sustained special exceptions and at the same time granted a motion for summary judgment. We first address the propriety of summary judgment. Before doing so, we again note that appellees did not move for summary judgment on the basis that the Shirvanians cannot prove the elements of their claims for fraud, negligent misrepresentation, or conspiracy. Appellees moved for summary judgment on their defenses. We resolve every reasonable inference in favor of the Shirvanians and take all evidence favorable to them as true. *See Science Spectrum*, 941 S.W.2d at 911.

### A. Summary Judgment Was Proper.

1. *The Shirvanians' claims are derivative under Delaware law.*

In their second issue presented, the Shirvanians assert the trial court erred in granting summary judgment on the ground that their claims are derivative, and thus are barred by the final judgment entered in the Delaware shareholder derivative lawsuit from which the Shirvanians did not opt out. Appellees argue the Shirvanians lack capacity to sue individually because, under Delaware law—which all parties agree controls the issue—the Shirvanians' claims are derivative, as they are predicated on the decline in the value of their Waste Management stock.

As mentioned at the beginning of the opinion, since this case was originally submitted, the Delaware Supreme Court issued an opinion in which it clarified the issues to be determined in analyzing whether a stockholders' suit is direct or derivative. *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del.2004). The Delaware court articulated the standard as follows: "The analysis must be based solely on the following questions: Who suffered the alleged harm—the corporation or the suing stockholders, individually—and who would receive the benefit of any recovery or other remedy?" *Id.* at 1035. To decide if the harm was to the corporation or to the stockholder individually, the court suggested the most relevant question is whether the stockholder can prevail without showing an injury to the corporation. *Id.* at 1036. A court should look to the nature of the wrong and to whom the relief should go. *Id.* at 1039. The stockholder's claimed direct injury must be independent of any alleged injury to the corporation. *Id.* The stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing a corresponding injury to the corporation. *Id.*

Applying those principles here leads to the conclusion that the Shirvanians' complaints are derivative, not direct, and could be asserted only on behalf of the corporation. The misrepresentations the Shirvanians allege caused their injury were based on mismanagement of the corporation's assets. The Shirvanians cannot prove their injury without proving an injury to the corporation. We hold, therefore, that the Shirvanians' suit is derivative under Delaware law.

2. *The Shirvanians' claims are barred by res judicata.*

■ Two derivative lawsuits brought in Delaware state court on behalf of all Waste Management stockholders were consolidated in the case styled, *In re Waste Management, Inc. Shareholders Derivative Litigation.* The shareholder derivative litigation settled and final judgment was entered on September 20, 2001. The judgment states that all shareholders were given notice of the settlement and an opportunity to object. The judgment further provides that it has res judicata effect as to "all claims and issues that have or could have been raised." The judgment provides it has a preclusive effect in all pending and future lawsuits encompassed by the release. The release encompasses all causes of action that have been or could have been alleged or asserted by shareholders or the company for damages or equitable relief.

■ Res judicata precludes relitigation of claims that have been finally adjudicated, or that arise out of the same subject matter and could have been litigated in a prior action. *Amstadt v. U.S. Brass Corp.,* 919 S.W.2d 644, 654 (Tex.1996). Res judicata requires proof of the following elements: (1) a prior final judgment on the merits by a court of competent jurisdiction; (2) identity of parties or those in privity with them; and (3) a second action based on the same claims as were raised or could have been raised in the first action. *Espeche v. Ritzell,* 123 S.W.3d 657, 665 (Tex.App.-Houston [14th Dist.] 2003, pet. denied). Because we have determined the Shirvanians' claim is derivative, not direct, the Shirvanians' suit is barred by res judicata and should have been brought in the consolidated shareholders' derivative action. Accordingly, summary judgment was proper. The Shirvanians' second issue is overruled.

**B. Special Exceptions Were Properly Sustained.**

In their first issue, the Shirvanians contend the trial court erred in granting appellees' special exceptions. When reviewing a trial court's dismissal of a cause of action on special exceptions, we must accept as true all of the factual allegations set out in the challenged pleading. *Aranda v. Insurance Co. of N. Am.,* 748 S.W.2d 210, 213 (Tex.1988). The legal conclusions of the trial court as to whether the plaintiff's petition adequately established a cause of action are subject to de novo review in this court. *Boales,* 29 S.W.3d at 163. Appellees filed special exceptions in which they contended the Shirvanians failed to state a viable individual cause of action. Because the Shirvanians' claims were of a derivative nature and not individual claims, even accepting the Shirvanians' allegations as true, they failed to state a viable individual cause of action. Accordingly, the trial court properly sustained the special exceptions. The Shirvanians' first issue is overruled.

**C. The Trial Court's Judgment Was Not Overbroad.**

■ In their third issue, the Shirvanians contend the trial court's judgment is overbroad in that it grants relief not addressed in the special exceptions or summary judgment motion. The Shirvanians contend that appellees failed to address, in their special exceptions or their motion for summary judgment, the Shirvanians' claims regarding the tax liability of exercising the options. The Shirvanians exercised options to purchase 885,366 shares of Waste Management stock at $6.8333 per share when the market value of the stock was $53.75 per share. The Shirvanians contend they had to pay taxes on the value of the shares on July 30, 1999, before the price of the stock dropped.

The Shirvanians' original petition, however, did not raise a cause of action for overpayment of taxes. While the Shirvanians recited, in the factual background of their petition, their exercise of the stock options, the only fraud claims asserted against appellees were based on alleged misrepresentations that caused the Shirvanians not to sell their stock. After the trial court ruled on appellees' special exceptions and motion for summary judgment, the Shirvanians filed a document titled "Plaintiff's Motion for New Trial, Motion for Reconsideration and Request for Leave to Amend." Attached to that motion was Plaintiff's First Amended Petition. In the amended petition, the Shirvanians included an allegation that, in relying on appellees' misrepresentations, they exercised options to purchase 800,000 shares of Waste Management stock. Although the value of the Waste Management stock declined significantly, it did not decline below the $6.8333 paid by the Shirvanians when they exercised their options. Therefore, the Shirvanians' injury from the exercise of the options was the payment of taxes on the value of the shares on July 30, 1999.

Texas follows a "fair notice" standard for pleading, which looks to whether the opposing party can ascertain from the pleading the nature and basic issues of the controversy and what testimony will be relevant. *See Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 896–97 (Tex. 2000). Here, because no cause of action was pleaded prior to the trial court's ruling, appellees could not be expected to address a cause of action that had not yet been pleaded. The trial court did not err because the cause of action was not before the court at the time of its ruling. The Shirvanians' third issue is overruled.

In their fourth issue, the Shirvanians contend the trial court erred in refusing to permit them to amend their petition after sustaining appellees' special exceptions. After the trial court sustains special exceptions, it may not dismiss a suit until the party has been given an option to amend, unless the trial court can determine that an amendment will not cure the defect. *Geochem Labs., Inc. v. Brown & Ruth Labs. Inc.*, 689 S.W.2d 288, 290 (Tex.App.-Houston [1st Dist.] 1985, writ ref'd n.r.e.). Summary judgment may also be proper if a pleading deficiency is of the type that could not be cured by an amendment. *Ryan v. Friesenhahn*, 911 S.W.2d 113, 115 (Tex.App.-San Antonio 1996), aff'd by, 960 S.W.2d 656 (Tex.1998). Here, the Shirvanians could not have cured the defect in their pleadings by an amendment. Their claim for overpayment of taxes is a derivative shareholders' claim because their injury derives from the drop in the stock's value and cannot be separated from that of the corporation. *See Tooley*, 845 A.2d at 1039. Because the proposed amended pleadings could not cure the defect, the trial court did not err in denying the Shirvanians' request for leave to amend. The Shirvanians' fourth issue is overruled.

### Conclusion

Because we conclude the Shirvanians' claims are derivative under Delaware law, the claims are barred by the release executed in the derivative lawsuit brought in Delaware state court by Waste Management shareholders. We affirm the trial court's order sustaining appellees' special exceptions and granting summary judgment in their favor.

Former Chief Justice SCOTT BRISTER not participating.