G.R. Tech., Inc. v. Casella Waste Sys., Inc., No. 503-7-08 Rdcv (Eaton, J., Feb. 10, 2010)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

# STATE OF VERMONT
# RUTLAND COUNTY

| | | |
|---|---|---|
| **G.R. TECHNOLOGY, INC.** | ) | |
| **derivatively on behalf of** | ) | |
| **GREEN MOUNTAIN GLASS, LLC** | ) | **Rutland Superior Court** |
| **and CULCHROME, LLC** | ) | **Docket No. 503-7-08 Rdcv** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **CASELLA WASTE SYSTEMS, INC.,** | ) | |
| **FCR, LLC, JOHN CASELLA,** | ) | |
| **JAMES BOHLIG, SEAN DUFFY,** | ) | |
| **and PAULA CALABRESE** | ) | |


## SUPPLEMENTAL DECISION RE: AMENDED MOTION TO DISMISS

This docket is a derivative action filed by the minority shareholder in two limited liability companies organized under the laws of Delaware. The minority shareholder alleges eighteen separate causes of action in the derivative complaint, but many of the causes of action are also stated as direct claims in a companion case known as *Casella Waste Systems, Inc. v. G.R. Technology, Inc.*, No. 409-6-07 Rdcv. The present question before the court is whether some of the derivative claims should be dismissed on the ground that they are solely direct, rather than derivative, in nature.

The court partially denied the amended motion to dismiss on October 15, 2009, to the extent that it sought dismissal of the entire derivative complaint. The court explained that under well-established Delaware law, there was no reason why the minority shareholders could not institute parallel direct and derivative actions. The court invited both parties to file supplemental memoranda, however, on the question of whether some of the individual causes of action stated in the derivative complaint should be dismissed. Both parties filed additional papers on November 10, 2009. The court has now reviewed those memoranda and issues this supplemental decision with respect to the amended motion to dismiss.

### I.

In distinguishing between direct and derivative claims, it is the responsibility of the court to "independently examine the nature of the wrong alleged and any potential relief to make its own determination of the [claim's] classification." *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1035 (Del. 2004). This means that the court must look beyond plaintiff's characterization of the claim and attempt to divine, from the allegations in the complaint, whether the claim is direct or derivative in nature.[1]

---

[1] It does not help the analysis that, although plaintiffs provided a general factual overview in the complaint, they did not identify the specific facts that give rise to each cause of action. Furthermore,

The court accordingly begins with the following facts, which are taken from the derivative complaint and viewed in the light most favorable to plaintiffs.

Historically, glass manufacturers seeking to produce new glass containers from recycled materials were limited to the use of single-colored crushed glass (also known as cullet). This meant that processors had to separate glass by color before it could be used in the manufacturing process. Thus, green cullet could be used to make new green bottles, but mixed-color cullet was more or less a waste product.

Between 1998 and 2002, G.R. Technology and Professor Lehman developed technology intended to enable glass manufacturers to use mixed-color cullet in the production of new glass bottles. The idea was that the technology would create new market opportunities for unsorted, mixed-color cullet, which had heretofore represented a disposal cost to most processors and manufacturers. The research efforts led to several patents, which are referred to herein as the Lehman patents.

In early 2003, GRT principals Lame and Billmyer began seeking business venture partners in order to develop and commercialize the intellectual property. They were introduced to Bohlig and Duffy, who were principals at CWS and FCR. Subsequent negotiations led to the signing of a development agreement in April 2003.

The development agreement contained a number of confidentiality provisions. It also licensed the Lehman patents to FCR for an initial development period, during which FCR was granted the authority to further refine and market the technologies as an agent for GRT. In the event that the development period was successful, the parties contemplated a joint venture for the purpose of holding and marketing the intellectual property.

Towards this end, the parties created two new limited liability companies. CulChrome LLC was created for the purpose of holding the patents, and Green Mountain Glass LLC was created for the purpose of marketing and sublicensing the technology. The majority voting member in both companies was FCR (51%) and the minority voting member was GRT (49%).

The central allegation in the complaint is that FCR misappropriated intellectual property during the development period. It seems that FCR hired a consulting firm to help in the development, and met with the consultants and Prof. Lehman several times, including a meeting in Charlotte in July 2003. Although the meeting was intended to further secure and develop the existing patents, Lame and Billmyer were apparently not

---

plaintiffs have alleged the same harm in nearly every count of the complaint. See, e.g., ¶¶ 89, 93, 99, 102, 105, 109, 112, 117, 120, 123, 126, 133, 136, 139 ("As a direct, proximate and foreseeable result of such conduct, Plaintiffs herein suffered damages, *inter alia*, in the form of lost business opportunities, lost equity and ownership interest, lost profits, lost income, attorneys' fees and costs, and other pecuniary damages."). It is the responsibility of the court to look beyond this generic pleading and assess, for itself, whether the claims are derivative or direct in nature.

invited. The end result of the meeting was a list of suggested additional patent applications arising out of the original Lehman intellectual property.

FCR then allegedly took this list and prepared a series of patent applications under its own name dealing with the production and brokering of mixed-color cullet. FCR did not tell GRT about the patent applications.

FCR and CWS then submitted a proposal to operate a landfill in Ontario County, New York. The August 2003 proposal included a representation that FCR and CWS had purchased a controlling interest in patented mixed-glass technology that would allow the commingling of all mixed-color glass. The proposal was submitted, however, before FCR had obtained any ownership interest in the Lehman technology (since the patents were still held by GRT and had not yet been assigned to CulChrome). GRT was not informed that the proposal had been made.

The development period was completed in October 2003. It was only at that point that GRT assigned the Lehman patents to CulChrome. Green Mountain Glass was thereafter in the business of marketing and licensing the Lehman technology, which supposedly included business opportunities in the field of processing and brokering mixed-color cullet.

FCR nevertheless allegedly entered into a number of public and private contracts relating to the processing and brokering of mixed-color cullet under its own name. The allegation is that these opportunities were competitive with the business plan that the parties had laid out for Green Mountain Glass. FCR and CWS have taken the position that they had the right to enter into their separate contracts, and that neither Green Mountain Glass nor CulChrome have any right to the revenues generated from these contracts.

The parties then engaged in a series of negotiations seeking a "business solution" to the problems described herein. The attempts were ultimately unsuccessful, and the present litigation followed.

II.

Derivative lawsuits are intended to permit shareholders to sue directors on behalf of the corporation for an alleged breach of their fiduciary duties to the corporation, and are necessary safeguards in ensuring that management honors its obligations to shareholders. It is essentially the corporation itself who is the plaintiff in a derivative action. Direct lawsuits, on the other hand, are brought by the shareholders in their individual capacities to enforce their own rights and remedy their own injuries. 2 ALI Principles of Corporate Governance § 7.01(a)–(b).

In this case, the minority shareholders filed a direct action and a derivative action, and both contain essentially the same allegations and causes of actions. Since the consequences that arise from the characterization of the action include whether recovery

3

will flow to the shareholders themselves or instead to the limited liability companies (and their creditors), and whether and how attorneys' fees will be paid, the task presently before the court is ensuring that the claims asserted in the derivative action are, in fact, derivative in nature.[2]

The test for distinguishing derivative claims from direct claims "turn[s] solely on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)." *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004). In short, a claim should be characterized as a direct action when the stockholder can prevail without showing an injury to the corporation, and as a derivative action when the stockholder can prevail only by showing that the wrongful act depleted corporate assets and thereby injured the shareholders indirectly. 2 ALI Principles of Corporate Governance § 7.01(a)–(b). It must additionally be kept in mind that the same set of facts may give rise to both direct and derivative claims. *Loral Space & Communications, Inc. v. Highland Crusader Offshore Partners, L.P.*, 977 A.2d 867, 869–70 (Del. 2009).

The first set of claims asserted in the derivative complaint are rooted in a breach of the fiduciary duty of loyalty. These counts generally assert that defendants took the licensed technology that belonged to CulChrome and misappropriated it for their own uses, and that defendants also took for themselves a number of business opportunities that should have belonged to Green Mountain Glass. As stated in the complaint, these counts include Count IV (breach of fiduciary duty), Count V (assisting others to breach fiduciary duty), Count VI (induced infringement), Count VII (tortious interference with business relations), Count XIII (conversion), and Count XVI (usurpation of business/corporate opportunities).[3] Defendants have conceded that all of these counts are properly asserted in the derivative complaint.

Count III (unjust enrichment) is along the same lines, but the parties dispute whether unjust enrichment is a permissible claim in a derivative action. In generic terms, unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del. 1988). Here, the allegation is that defendants retained the benefit of the misappropriated intellectual property and the misappropriated business opportunities. This is really no different from the derivative claims that defendants have conceded

---

[2] The question of whether any causes of action asserted in the direct lawsuit are actually solely derivative in nature is not before the court at this time. The court does not anticipate that a motion to dismiss will be filed in that action, given that the counterclaims (i.e., the direct claims) have already been answered, and that discovery has long since been underway. A motion for summary judgment filed at the appropriate time would be the better forum in which to test those claims.

[3] Defendants contend that Count XVI should be dismissed for failure to state a claim because "usurpation of business/corporate opportunities" is not a cognizable cause of action. It seems to the court that this is a claim for breach of the fiduciary duty of loyalty, and there is no need to dismiss it at this time. The fact that the claim appears to be more or less duplicative of the other fiduciary-duty counts can be addressed at a later time.

above. Of course, there are questions about whether a quasi-contractual claim is appropriate in light of any express agreements that may have been made, and whether an election-of-remedies issue would be present if plaintiff prevailed in demonstrating that the same conduct resulted in liability for breach of fiduciary duty and unjust enrichment. But these concerns do not require dismissal of the unjust enrichment claim at this time. See *McPadden v. Sidhu*, 964 A.2d 1262, 1276–77 (Del. Ch. Aug. 29, 2008) (declining to dismiss unjust enrichment claim from derivative action despite noting same concerns).

The next claim is rooted in a breach of the fiduciary duty of care. Count XVIII is styled as an ordinary claim for negligence, but the central allegation is that defendants negligently mismanaged the limited liability companies. This appears to the court to be an allegation that defendants breached their fiduciary duties of care in managing the companies, which is a permissible derivative claim. See *In re Walt Disney Co. Derivative Litigation*, 906 A.2d 27, 52 (Del. 2006) (discussing duty-of-care claims in derivative litigation).

The next set of claims contain allegations that defendants negligently or intentionally misrepresented or concealed certain facts in order to induce plaintiffs to "enter[] into the transactions described above." It is not entirely clear from the derivative complaint what misrepresentations were made, or what transactions plaintiffs were induced to enter into. Yet it can be inferred with a reasonable degree of certainty that these claims are alleging that GRT was induced by misrepresentations into transferring the Lehman patents to FCR and CulChrome. It appears to the court, therefore, that these claims seek to redress harms suffered by GRT, and that they are accordingly direct in nature. See *Albert v. Alex. Brown Management Services, Inc.*, 2005 WL 5750602 at *12 (Del. Ch. Aug. 26, 2005) ("Generally, non-disclosure claims are direct claims."); *FS Parallel Fund L.P. v. Ergen*, 2004 WL 3048751 at *3 (Del. Ch. Nov. 3, 2004) ("[A] fraud claim is inherently direct, under either pre- or post-*Tooley* analysis.").

Plaintiffs contend that these claims are also derivative in nature because defendants owed duties to the limited liability companies, and because defendants breached these duties by making misrepresentations, withholding information, or otherwise committing fraud upon the companies. Plaintiffs have not referenced, however, any specific transactions that the limited liability companies were induced to enter into by reason of a negligent or intentional misrepresentation. And even if there were an allegation that the limited liability companies were induced to refrain from entering into a transaction (which there is not), it is hard to see how this would not be covered by the foregoing counts alleging breach of the fiduciary duty of loyalty. The court accordingly views the claims stated in Count I (negligent provision of financial information), Count II (constructive fraud), Count VIII (consumer fraud),[4] Count XII

---

[4] The claim for consumer fraud alleges that defendants' actions constituted unfair methods of competition and/or deceptive acts or practices in the conduct of any trade or commerce "in violation of the Vermont Consumer Fraud Act." It is not apparent to the court how the facts of this case give rise to a claim for violation of the Vermont CFA (such as how the limited liability companies would be consumers within the meaning of the statute) and plaintiffs have not provided any explanation other than to say that defendants committed fraud on the limited liability companies (which is a direct claim, as noted above). In

(fraudulent inducement), and Count XVII (failure to provide sufficient information to allow informed consent) as direct in nature. The amended motion to dismiss these counts from the derivative complaint is granted.

The next set of claims involve breach of contract (Count X) and breach of the contractual duty of good faith and fair dealing (Count XI). Again, it is not totally clear what conduct gives rise to the claims, as plaintiffs have alleged only that defendants breached "the contracts between the parties," and that whatever defendants did also constituted a breach of the implied covenant of good faith and fair dealing. Based on the factual allegations in the complaint, the court interprets these claims as alleging that defendants breached contractual confidentiality provisions during the period in which FCR was refining and marketing the Lehman technologies as an agent for FCR. This would be a direct claim because the confidentiality provisions were allegedly set forth in a contract between FCR and GRT, and because the alleged harm took place before the limited liability companies obtained any interest in the technologies. See *Albert*, 2005 WL 5750602 at *12 ("The claims for breach of contract . . . are direct.").

Plaintiffs have not identified any contracts between defendants and the limited liability companies themselves, other than perhaps the LLC operating agreements. If the claim is that defendants breached their obligations of loyalty and care set forth in the operation agreements, it can be adequately addressed under the breach-of-fiduciary-duty claims set forth elsewhere in the complaint. And if the claim is that defendants breached the provisions of the operating agreements pertaining to the proper procedure for initiating lawsuits on behalf of the company, it appears to be generally well-settled that actions challenging unauthorized corporate acts are direct in nature. 2 ALI Principles of Corporate Governance § 7.01, cmt. c. Thus, in the absence of any explanation as to why the contractual claims are derivative in nature, they will be dismissed from the derivative complaint.

The next issue is whether the "claim" for punitive damages (Count XIV) should be dismissed. It seems obvious to the court that a motion to dismiss is not the proper time or place to test whether a claim for punitive damages is supported by the facts of the case, and the court will not grant dismissal at this time. Yet there appears to be a legitimate question as a matter of Delaware law as to whether punitive damages are available in stockholder derivative litigation. See *Elf Atochem North America, Inc. v. Jaffari*, 727 A.2d 286, 292 n.31 (Del. 1999) (explaining that the Delaware Court of Chancery does not have jurisdiction to award punitive damages) (citing *Beals v. Washington Intern., Inc.*, 386 A.2d 1156, 1159 (Del. Ch. 1978)). The court does not reach that issue here, since the parties have not briefed it; any questions about the appropriateness of punitive damages in the derivative litigation can be taken up in due course.

The last issue is whether the claims for civil conspiracy (Count IX) and respondeat superior (Count XV) should be dismissed. It is clear that these "claims" are

the absence of any information explaining the claim in more detail, this appears to be, if anything, solely direct in nature.

6

not independent causes of action, but rather theories of liability that link individual defendants to some underlying harm. *Davis v. West Center City Neighborhood Planning Advisory Committee*, 2003 WL 908885 at *3 (Del. Super. Mar. 7, 2003); *Arnold v. Society for Sav. Bancorp, Inc.*, 1995 WL 376919 at *8 (Del. Ch. Jun. 15, 1995) (discussing respondeat superior). The "counts" will accordingly be dismissed from the complaint to the extent that they purport to set forth independent derivative causes of action.

Yet there is no need to dismiss the factual allegations of civil conspiracy and agency to the extent that they serve to link individual defendants to the underlying derivative causes of action. The factual allegations may remain a part of the case even though the "counts" have been dismissed. See *Davis*, 2003 WL 908885 at *3 (explaining that although civil conspiracy is not an independent cause of action, it can be alleged where there is an underlying harm in which more than one person participated).

In the final analysis, the derivative complaint sets forth valid claims rooted in allegations of breaches of the fiduciary duties of care and loyalty. The amended motion to dismiss is granted, however, as to the direct claims rooted in allegations of fraud and breach of contract, and as to the separate "counts" for civil conspiracy and agency.

### ORDER

Defendants' Amended Motion to Dismiss (MPR #1) is ***granted in part*** as to Counts I, II, VIII, IX, X, XI, XII, XV, and XVII, and ***denied*** as to all other causes of action asserted in the derivative complaint.

Dated at Woodstock, Vermont this \_\_\_\_ day of February, 2010.

_____
Hon. Harold E. Eaton, Jr.
Superior Court Judge

7