[840 NYS2d 16]

CAPITAL Z FINANCIAL SERVICES FUND II, L.P., et al., Appellants-Respondents, v HEALTH NET, INC., Respondent-Appellant.

First Department, July 5, 2007

---

### APPEARANCES OF COUNSEL

*Kasowitz, Benson, Torres & Friedman, LLP*, New York City (*Michael M. Fay, David S. Rosner, Kim Conroy* and *Jenny H. Kim* of counsel), for appellants-respondents.

*Munger, Tolles & Olson LLP*, Los Angeles, California (*Brad D. Brian, Ronald K. Meyer, Alexandra Lang Susman*, of the California bar, admitted pro hac vice, of counsel), and *Skadden, Arps, Slate, Meagher & Flom LLP*, New York City (*Jeremy A. Berman* and *Henry P. Wasserstein* of counsel), for respondent-appellant.

### OPINION OF THE COURT

MAZZARELLI, J.P.

Plaintiffs[1] (Cap Z) are four limited partnerships which together invested 100 million dollars in the stock of nonparty Superior National Insurance Group (Superior). The investment was made to help fund Superior's purchase of the Business Insurance Group, Inc. (BIG), a set of four California workers' compensation insurers, from Foundation Health Corp., a predecessor in interest to defendant Health Net.[2]

During the preliminary discussions of the purchase in early 1998, plaintiffs became concerned that BIG's "loss reserves"

---

**1.** Plaintiffs include four limited partnerships: (1) Capital Z Financial Services Fund II, L.P. (a Bermuda limited partnership); (2) Capital Z Financial Services Private Fund II, L.P. (a Bermuda limited partnership); (3) Insurance Partners, L.P. (a Delaware limited partnership); and (4) Insurance Partners Offshore (Bermuda) (a Bermuda limited partnership). Plaintiffs are collectively referred to as Cap Z.

**2.** For ease of reference, Health Net and its predecessors (Foundation Health Corp. and Health Systems Inc.) are referred to as Health Net throughout.

and "loss adjustment expense reserves"[3] were insufficient to meet BIG's anticipated liabilities for claims and adjustment expenses. As a result, Health Net had its financial advisor, Milliman & Robertson, Inc. prepare a report itemizing BIG's assets and liabilities. This report was provided to plaintiffs in March 1998 (the 3/98 M & R report). Based upon the information in the M & R report, BIG increased its reserves for the period ending December 31, 1997 to $521.6 million. However, Superior and Cap Z were still unsure about acquiring BIG, and questioned the accuracy of the M & R report's projection of BIG's liabilities.

Superior and Cap Z themselves retained four experts. Those experts concluded that the M & R report underestimated BIG's anticipated liabilities for claims and expenses. Superior and Cap Z then informed Health Net that Superior would not purchase BIG unless either it or BIG obtained insurance to cover reserve deficiencies of up to 175 million dollars. The coverage was obtained from American Reinsurance Company (American Re).

In May 1998, Superior and Health Net entered into a detailed Purchase Agreement for BIG. Plaintiffs are not signatories of document, but are listed by name in article III, section 3.5 thereof, as "financiers" of the transaction.

Article II of the agreement, entitled "Representations and Warranties of the Seller," states, in section 2.6, that BIG's financial statements were furnished to Superior, and that:

> "Each of the balance sheets . . . fairly presents in all material respects the financial position of the applicable Seller Subsidiary as of December 31, 1997 and each statement of operations . . . fairly presents in all material respects the results of operations of the applicable Insurance Subsidiary for the period therein set forth, in each case in accordance with statutory and accounting practices prescribed or permitted by the respective state of domicile."

Section 2.6 (c) of the Purchase Agreement warns that Health Net is not making any representations or warranties as to BIG's

---

**3.** Under California law, every insurer, including BIG, is required to maintain "reserves." Reserves are funds created for the purpose of paying out on anticipated claims by insurance policyholders and the costs related thereto. Reserve levels are set based upon estimates of future claims and costs. They consist of two components: "loss reserves," which are an estimate of the insurer's total anticipated liability for unpaid claims; and "loss adjustment expense reserves," which are an estimate of the insurer's total anticipated liability for expenses incurred in adjusting claims.

reserves. In addition, by article III of the Purchase Agreement, entitled "Representations and Warranties of Purchaser," section 3.6 (a), Superior acknowledges that it is aware that Health Net has not made any representations or warranties as to BIG's reserves, except those specifically set forth in article II of the Purchase Agreement.

Article IV of the Purchase Agreement, "Covenants," section 4.6 (e), provides:

> "Seller shall give prompt notice to Purchaser of the occurrence of any Seller Material Adverse Effect . . . Each of Seller and Purchaser shall give prompt notice to the other of the occurrence or failure to occur of an event that would, or, with the lapse of time would, cause any condition to the consummation of the transactions contemplated hereby not to be satisfied."

Section 4.11 (b) also requires Health Net to deliver to Superior financial statements for BIG. These were to include a balance sheet and a statement of operations as of the end of each quarter "within 30 days after" the date of the execution of the Purchase Agreement, and continuing until the closing on the acquisition.

Article V, section 5.1 of the Purchase Agreement requires that Health Net indemnify Superior and its "affiliates"[4] for specified losses resulting from any breach of the warranties or covenants in the Purchase Agreement. Sections 5.3 and 5.4 of the Purchase Agreement, the indemnification provisions, provide that notice of any claim against Health Net be given within one year of the closing date of the sale. Article VI, section 6.3 (a), states that all of the representations in article III are "true and accurate as of the Closing Date as if made at and as of such time."

Finally, the Purchase Agreement designates, in section 8.1, that the laws of Delaware "shall govern all issues concerning the validity of this Agreement, the construction of its terms and the interpretation and enforcement of the rights and duties of the parties." The closing on the BIG acquisition occurred on or about December 10, 1998.

Because Superior's acquisition of BIG required shareholder approval, Health Net entered into two Voting Agreements, one with plaintiff Insurance Partners, L.P. (IP), the other with plaintiff Insurance Partners Offshore (IP Offshore). IP and IP

---

4. Health Net does not dispute that Cap Z is an "affiliate" of Superior as defined in section 8.4 (a) of the Purchase Agreement.

Offshore, together, are the largest shareholders of Superior. The Voting Agreements allowed Health Net to vote IP and IP Offshore's shares in favor of any proposal necessary for Superior to successfully close the BIG acquisition. In addition, Health Net promised, in both Voting Agreements, not to amend the Purchase Agreement. The Voting Agreements also include a Delaware choice of law provision which tracks the language of that in the Purchase Agreement.

The sale to Superior took place in December 1998. In February 1999, M & R prepared an actuarial analysis of BIG's reserves for the year ending December 31, 1998 (the 2/99 M & R report). That report showed substantially greater losses and underreserving on the part of BIG than the earlier 3/98 M & R report had estimated. M & R reported these facts to BIG and advised it to increase its claim reserves. By June 1999, BIG's financial condition had seriously declined and Superior contacted American Re, and "demanded, that [the insurer] perform its obligations under the Reserve Cover." Superior requested that American Re deposit at least 150 million dollars with the California Department of Insurance. American Re refused, claiming it would never have entered into the contract had it known of BIG's actual financial condition. Superior thereafter settled with American Re and American Re paid some of the reserves.

Eventually, Superior was unable to cover the reserves and both Superior and BIG became insolvent. On March 3, 2000, California insurance regulators seized Superior's insurance companies, including BIG. In April 2000, Superior filed for bankruptcy.

As part of the liquidation of Superior's assets, a "Litigation Trust" was created. That entity sued Health Net in California, making claims similar to those raised here. After three years of litigation, the parties reached a settlement. Health Net agreed to pay the Litigation Trust $132 million in exchange for a release of all of Superior's claims against it. The settlement was approved by the Bankruptcy Court in December 2003. This action by Cap Z followed.

The complaint, in its four causes of action, contains allegations that between the May 1998 execution of the Purchase Agreement and the December 1998 closing, M & R recalculated BIG's expected losses twice, at defendant's behest. Both times, plaintiffs claim, M & R determined that BIG's estimated losses far exceeded its $521.6 million in actual reserves. Plaintiffs contend that M & R shared this information with Health Net

and BIG's management, but Health Net withheld it from Superior and Cap Z. Plaintiffs allege that from August to November 1998 Health Net made oral and written misrepresentations to plaintiffs and Superior, that no new calculations had been received from M & R. Plaintiffs also claim that during this time Health Net concealed information it had, which demonstrated that Superior and Cap Z's corrected claims-related liability calculations were grossly understated. Plaintiffs further allege that BIG's reserve deficiency at the time of the December 1998 closing was, in truth, in excess of $400 million.

The first cause of action seeks indemnification under the Purchase Agreement for damages plaintiffs incurred as a result of Health Net's alleged breach of express warranties and covenants in that contract, in intentionally understating BIG's reserves. In the second cause of action IP and IP Offshore allege that Health Net breached the implied covenant of good faith and fair dealing implicit in the Voting Agreements by misrepresenting BIG's financial situation, and thereby depriving these plaintiffs of the benefits that they expected from their agreement to have their shares voted in favor of the acquisition. The third cause of action, dismissal of which is not contested on appeal, alleged that Health Net fraudulently induced IP and IP Offshore to enter into the Voting Agreements. Finally, in the fourth cause of action, Cap Z alleges that Health Net fraudulently induced all four limited partnerships to finance Superior's purchase of BIG by misrepresenting the value of the investment based upon BIG's financial condition.

Health Net moved to dismiss plaintiffs' claims pursuant to CPLR 3211 (a) (1), (3) and (7). It alleged that all of the claims asserted in the complaint were shareholder derivative claims belonging to Superior. It argued that plaintiffs, as shareholders, could not pursue an individual action for damages. Defendant asserted that any action brought by plaintiffs would require a demand on Superior's Board of Directors, and the requisite formalities of a shareholder derivative suit, none of which took place here.

Alternatively, Health Net challenged the merits of each of plaintiffs' causes of action. It asserted that plaintiffs' first cause of action for breach of contract was untimely, as plaintiffs did not give Health Net notice within one year of the alleged breach of the Purchase Agreement, as required by that contract. Health Net next asserted that the alleged breach of an implied covenant of good faith and fair dealing of the Voting Agreements

was untenable. This, it argued, was because defendant's obligations under those contracts were extremely limited, and the duties plaintiffs sought to imply would have entailed a substantial reformation of those agreements. Health Net also challenged plaintiffs' fourth cause of action for fraud. It said that plaintiffs could not substantiate their claim that they relied upon Health Net's representations as to the value of BIG's reserves before determining to make their investment. Health Net asserted that Cap Z and Superior had their own experts evaluate BIG's finances, noting that they preconditioned their investment on BIG's obtaining insurance.

Plaintiffs opposed defendant's motion. They argued that as financiers of the acquisition, they had standing to make direct claims against Health Net. Plaintiffs asserted that the first cause of action for indemnification was not time-barred, because the language in the agreement regarding "survival of claims" did not express an unambiguous intent to shorten the statutory limitation period for an action for breach of contract. Plaintiffs claimed that they had substantiated their claims for breach of the implied covenant of good faith and fair dealing and fraud. They also argued that punitive damages were proper because of Health Net's willful misconduct. Finally, plaintiffs requested that in the event that the court dismissed any of their claims, they be granted leave to amend their complaint to assert the remaining causes of action.

The IAS court found that plaintiffs, as financiers of the BIG acquisition, had standing to assert direct claims against Health Net, and that their rights were not derivative of Superior's. On the merits, the court determined that plaintiffs' first cause of action for breach of the indemnification provision was timely. However, the court dismissed the remainder of plaintiffs' claims. It found no breach of the implied covenant of good faith and fair dealing implicit in the Voting Agreements and no fraud in the inducement of plaintiffs IP and IP Offshore's agreement to enter into the Voting Agreements. The court also dismissed the fourth cause of action, finding that Cap Z had not entered into the Purchase Agreement based upon misplaced reliance upon defendant's alleged misrepresentations. Finally, the Court struck the request for punitive damages because the only claim that it kept viable was not a wrong directed at the public generally.

On appeal, plaintiffs argue that the IAS court correctly sustained the first cause of action, and erroneously dismissed

the second and fourth causes of action. Plaintiffs contend that the IAS court misperceived the fact that their fraud claim was based, in large part, on acts and omissions that took place between the May 1998 execution of the Purchase Agreement and the December 1998 closing on the deal. Defendant cross-appeals, arguing that the complaint should be dismissed in its entirety.

The first cause of action is for breach of the Purchase Agreement, and that contract clearly and unambiguously provides that Delaware law governs any disputes as to the rights and duties of the parties thereunder. Thus the question of whether plaintiffs can sue defendant directly for breach of contract requires the application of the laws of Delaware.

Defendant contends that under Delaware law the first cause of action must be dismissed because plaintiffs, as shareholders of Superior, can only challenge the contractual indemnification provisions in the Purchase Agreement in a shareholder derivative action as fiduciaries of the corporation (see Tooley v Donaldson, Lufkin & Jenrette, Inc., 845 A2d 1031 [Del Sup Ct 2004]). This argument has merit.

In two recent cases, Agostino v Hicks (845 A2d 1110 [Del Ch 2004]) and Tooley v Donaldson, Lufkin & Jenrette, Inc. (supra), Delaware courts discussed the distinction between direct and derivative claims. The plaintiff in Agostino was a shareholder in a publicly traded company called Viasystems. In July of 2001, Viasystems' Board of Directors approved a financing deal involving one of two companies that had founded the company, Hicks, Muse, Tate & Furst, Inc. (HMTF). The deal included HMTF's infusion of $100 million into Viasystems, in exchange for $100 million in 14% promissory notes due in 2007, and warrants to purchase 10 million shares of Viasystems' stock at a penny a share. In the next year, Viasystems had serious financial problems. By October 2002, the company filed for bankruptcy. The Bankruptcy Court's restructuring plan eliminated Viasystems' public stock, including plaintiff's shares, for no consideration. However, holders of Viasystems' notes (i.e. HMTF) received new stock in the company in exchange for cancellation of its debts. The plaintiff brought the action against HMTF and others, alleging that the Viasystems-HMTF deal caused a "lock-up" of the company, precluding the pursuit of other value-maximizing transactions.

The Delaware Court of Chancery determined that because the plaintiff had not complied with the procedural requirements of a shareholder derivative action, his only viable alternative

was a direct claim for damages (*id.* at 1117). However, the court explained that:

> "[t]o pursue a direct action, the stockholder-plaintiff must allege more than an injury resulting from a wrong to the corporation. The plaintiff must state a claim for injury which is separate and distinct from that suffered by other shareholders or a wrong involving a *contractual right of a shareholder which exists independently of any right of the corporation*" (*id.* at 1118 [emphasis added]).

Because the plaintiff could not demonstrate that he was injured without showing parallel harm to the corporation, his action was deemed derivative and dismissed (*id.* at 1127).

Following *Agostino*, the Delaware Supreme Court decided *Tooley* (*supra*). The *Tooley* plaintiffs were minority shareholders of Donaldson, Lufkin & Jenrette (DLJ), an investment banking firm. In the fall of 2000 DLJ was being acquired by another similar firm, Credit Suisse Group. The transaction effecting the acquisition included a cash tender offer for the purchase of the stock of minority shareholders (*id.* at 1034). The plaintiffs alleged that in consummating the transaction, DLJ breached its fiduciary duties to them by agreeing to a 22-day extension under the merger agreement (*id.*). The plaintiffs sought the "lost time-value" of the cash paid for the DLJ shares (*id.* at 1033). The court dismissed the action, on the ground that the plaintiffs' complaint, as drafted, failed to assert an actionable claim for direct relief (*id.* at 1039).

Adopting the reasoning in *Agostino*, *Tooley* set forth a two prong test for determining whether a cause of action belongs to an individual shareholder (allowing a direct claim) or to a corporation (requiring a derivative action). *Tooley* instructed that courts should evaluate: (1) "[w]ho suffered the alleged harm—the corporation or the suing stockholder individually"; and (2) "who would receive the benefit of the recovery or other remedy?" (*Id.* at 1035.) An important consideration was whether the plaintiffs could prevail without showing an injury to the corporation. In fact, the court held that a resolution of this issue would be "helpful to analyzing the first prong of the analysis . . . . [and that] [t]he second prong . . . should logically follow" (*id.* at 1036).

Applying the *Tooley* test to the first cause of action for breach of contract, plaintiffs alleged that they invested $100 million in Superior stock to finance the purchase of BIG, and were dam-

aged because they lost the entire amount of their financing. Plaintiffs could not prevail without showing that Superior went bankrupt. Thus, plaintiffs' loss, like that of all of the other Superior stockholders, was merely incidental to Superior's financial ruin. Under both *Agostino* and *Tooley*, all of plaintiffs' contractual claims stemming from the Purchase Agreement should have been dismissed for lack of standing.

Plaintiffs argue, however, that the second and fourth causes of action do not derive from the contracts, and are therefore not governed by Delaware law but New York law. They assert that under New York law, the second and fourth causes of action should be sustained because Health Net withheld information, otherwise unavailable to plaintiffs, which induced them to enter into an agreement which caused them $100 million in losses. These arguments are unpersuasive.

The Purchase Agreement and the Voting Agreements contain identical choice of law provisions. These broadly state that Delaware law governs "all issues" concerning "enforcement of the rights and duties of the parties." While a limited choice of law provision may not apply to determine claims of fraud (*see Finance One Pub. Co. Ltd. v Lehman Bros. Special Fin., Inc.*, 414 F3d 325, 332 [2d Cir 2005], *cert denied* 548 US —, 126 S Ct 2968 [2006]), the challenged claims here fall squarely within the broad terminology used in the choice of law provisions. In fact, all of plaintiffs' claims require "construction of [the] terms [of the Purchase and Voting Agreements] and the interpretation and enforcement of the rights and duties of the parties [under them]" (*see Turtur v Rothschild Registry Intl., Inc.*, 26 F3d 304, 309-310 [2d Cir 1994] [applying New York choice of law provision to tort claim where brokers agreed that it covered any controversy arising out of or relating to subscription]).

Specifically, Health Net's duties regarding disclosure of information in its possession as to BIG's financial condition is a matter covered by the Purchase Agreement. In addition, whether Health Net breached its obligation of good faith and fair dealing with respect to the Voting Agreements requires an evaluation of its duties under those contracts. Finally, whether Cap Z was induced to finance Superior's purchase of BIG based upon material misrepresentations is also a matter governed by the parties' agreements. Accordingly, Delaware law governs the second cause of action claiming breach of the implied obligation of good

faith and fair dealing and the fourth cause of action asserting common-law fraud, and requires their dismissal.[5]

Even if evaluated under New York law, both the second and the fourth causes of action were properly dismissed. Notably, with respect to the fourth cause of action, plaintiffs have not established that defendant had any "peculiar knowledge" of deficiencies in the initial M & R report (*Danann Realty Corp. v Harris*, 5 NY2d 317, 322 [1959]; *cf., Steinhardt Group v Citicorp*, 272 AD2d 255, 257 [2000] [issues of fact as to whether defendants acted with superior knowledge to plaintiffs' detriment]). In addition, plaintiffs and Superior did their own investigation, and did not decide to invest in the BIG acquisition based solely upon the information supplied by Health Net.

The second cause of action alleges breach of the implied covenant of good faith and fair dealing inherent in the Voting Agreements (between IP and IP Offshore and Health Net). This was properly dismissed because the complaint fails to establish the elements of this cause of action.

> "Under Delaware law, an implied covenant of good faith and fair dealing inheres in every contract. . . . [It is] an implied covenant to interpret and to act reasonably upon contractual language that is on its face reasonable. . . . [The role of the court is] to extrapolate the spirit of the agreement from its express terms and based on that 'spirit,' determine the terms that the parties would have bargained for . . . had they foreseen the circumstances under which their dispute arose. . . . *The implied covenant cannot contravene the parties' express agreement and cannot be used to forge a new agreement beyond the scope of the written contract.*" (*Chamison v HealthTrust, Inc.-Hospital Co.*, 735 A2d 912, 920-921 [Del Ch 1999] [emphasis added and citations omitted], *affd* 748 A2d 407 [Del Sup Ct 2000]; *and see Pierce v International Ins. Co. of Ill.*, 671 A2d 1361, 1366 [Del 1996].)

The contracts at issue here, two Voting Agreements, required Health Net to vote shares by proxy in support of Superior's acquisition of BIG. They also precluded Health Net from amending the Purchase Agreement in any manner adverse to plaintiffs.

---

**5.** The parties do not dispute that the third cause of action, alleging fraudulent inducement with respect to the Voting Agreements, was properly dismissed.

Nothing in the Voting Agreements suggests any obligation to disclose negative information regarding BIG's financials. To add this requirement, under the guise of an implied obligation of "good faith and fair dealing," would frustrate the "spirit" of the agreements and constitute a substantial reformation of them in contravention of the law (see *Chamison v HealthTrust, Inc.*, 735 A2d at 920).

The fourth cause of action alleges that plaintiffs were induced to enter into the Voting Agreements and the Purchase Agreement based upon Health Net's misrepresentations and failure to inform them about the true status of BIG's financial state. Like the first cause of action, this claim arguably also belongs to Superior, such that plaintiffs would lack standing to assert it other than in a derivative action (see *Tooley, supra*).

However, assuming that plaintiffs are alleging that their specific investment was induced by fraudulent misrepresentations, the disclaimer in the Purchase Agreement was clear. It specifically precludes any claim that plaintiffs justifiably relied on the alleged representations and omissions of defendant in making their investment (*cf. Kronenberg v Katz*, 872 A2d 568 [Del Ch 2004], *affd* 2005 Del LEXIS 65). Moreover, according to the complaint itself, plaintiffs and Superior were aware in March 1998, when they received the initial M & R report, that the liabilities of BIG were underestimated. Superior commissioned four of its own experts to investigate BIG's financial health. All of those experts suggested that M & R had underestimated BIG's anticipated liabilities for claims and expenses. For this reason, Superior and plaintiffs conditioned the acquisition of BIG upon the procurement of insurance covering reserve deficiencies of up to 175 million dollars. Clearly, plaintiffs did not rely on the M & R report when they made their investment, and were not awaiting reanalyses of BIG's liabilities subsequent to the contract's execution. Their present allegations against defendant Health Net fail to state a claim under either Delaware or New York law.

Accordingly, the order of the Supreme Court, New York County (Helen E. Freedman, J.), entered May 5, 2006, granting defendant's motion pursuant to CPLR 3211 (a) to dismiss the complaint to the extent of dismissing the second, third and fourth causes of action, and striking the claim for punitive damages, should be modified, on the law, to dismiss the remaining

cause of action, and otherwise affirmed, with costs. The Clerk is directed to enter judgment dismissing the complaint.

ANDRIAS, FRIEDMAN, GONZALEZ and CATTERSON, JJ., concur.

Order, Supreme Court, New York County, entered May 5, 2006, modified, on the law, to dismiss the remaining cause of action, and otherwise affirmed, with costs. The Clerk is directed to enter judgment dismissing the complaint.