# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| THE JOSEPH PENAR FAMILY TRUST, by its Trustee, Joseph Penar, THE WALDER FAMILY TRUST, by its Trustee, Cecile Donnamarie Newkirk, ALLEN COOPER, SUE COOPER, and THE ALLEN AND SUE COOPER TRUST, by its Trustees, Allen and Sue Cooper, | ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | C.A. No. 10441-VCG |
| JASEN ADAMS, DAVID HARTCORN, and BRIAN TOLLEFSON, | ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| PREMIUM OF AMERICA, LLC and PREMIUM HOLDING, LLC, | ) ) ) | |
| Nominal Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: January 12, 2016
Date Decided: April 28, 2016

Norman M. Monhait and Carmella P. Keener, of ROSENTHAL MONHAIT & GODDESS, P.A., Wilmington, Delaware; OF COUNSEL: Cyril V. Smith and William K. Meyer, of ZUCKERMAN SPAEDER LLP, Baltimore, Maryland, *Attorneys for Plaintiffs*.

Stamatios Stamoulis, of STAMOULIS & WEINBLATT LLC, Wilmington, Delaware, *Attorney for Defendants Jasen Adams and David Hartcorn and Nominal Defendants Premium of America, LLC and Premium Holding, LLC*.

K. Tyler O'Connell and Travis J. Ferguson, of LANDIS RATH & COBB LLP, Wilmington, Delaware, *Attorneys for Defendant Brian Tollefson*.

GLASSCOCK, Vice Chancellor

This matter involves an entity, Premium of America, LLC ("POA"), formed by a bankruptcy court to receive the assets of two affiliated companies, Beneficial Assurance Ltd. and Premium Escrow Services, Inc. (collectively, "Beneficial"). Beneficial was in the viatical life-insurance business—that is, it purchased existing life insurance policies, designated itself as beneficiary of those policies, and assumed the obligation to make the premium payments. Obviously, under this model, the price paid by Beneficial for the policies relied on a determination of the life expectancy of the initial policy-holders whose lives were insured. According to the complaint, these insureds were typically ill with the AIDS syndrome or its underlying HIV virus. Fortunately for those individuals, and for society at large, during the course of Beneficial's business, medicine and medical technology greatly increased the life expectancy of those suffering from these conditions. Happy as that fact was, it is a good wind indeed that blows no man ill; as the period during which Beneficial was required to make premium payments, and to await benefits, greatly increased, its business model ceased to be viable.[1] Beneficial filed for bankruptcy in 2002.

When formed, POA had two classes of assets: the life insurance policies,

---

[1] I do not mean to disparage the viatical life-insurance industry. Obviously, by relieving the payment obligations of and accelerating (reduced) benefits for critically ill individuals, the industry provides a social good. A viaticum, a payment to fund a journey, is the rather poignant root for the term viatical.

which represented both a payment obligation and an ultimate source of funds once the insureds' lives ended, and choses in action, lawsuits against the brokers who initially placed the policies with Beneficial. The latter, apparently pursued vigorously and at great expense, ultimately proved fruitless. By the fall of 2013, the board of POA decided to liquidate the LLC and make a final distribution to members. It notified the members, former creditors of Beneficial, that it was making a final distribution of approximately $7 million and winding up operations. This notice did not indicate how the life-insurance assets of POA had been liquidated, nor how the amount available for distribution was computed.[2] Along with the notice, each member was given a check for its share of the final distribution.

The Plaintiffs are members of POA. They filed this action, asserting four counts: Count I, brought derivatively on behalf of POA against its managers, alleges self-dealing and conversion of assets in violation of fiduciary duties owed to the members; a second derivative count casts the same behavior as breaches of the LLC Agreements of POA, and a related entity, Premium Holding, LLC; and a third and fourth count restate Counts I and II as direct claims. This Memorandum Opinion concerns the Defendants' motions to dismiss. Unfortunately for the Plaintiffs, their complaint is a vessel incapable of bearing the freight of the issues for which they

---

[2] As will be described later in this Memorandum Opinion, the assets of POA were presumably held at the time by Premium Holding, LLC, an entity created as a defensive measure by a former board of POA, of which POA was the only member.

2

seek adjudication. For the following reasons, those motions are granted.

## I. BACKGROUND[3]

### A. *The Parties*

The Plaintiffs—the Joseph Penar Family Trust, by its Trustee, Joseph Penar; the Walder Family Trust, by its Trustee, Cecile Donnamarie Newkirk; Sue and Allen Cooper, individually; and the Allen and Sue Cooper Trust, by its Trustees, Sue and Allen Cooper—are all members, or assignees of member interests, in Nominal Defendant Premium of America, LLC ("POA"), a Delaware limited liability company governed by a "2003 Limited Liability Company Agreement" (the "POA LLC Agreement").[4] POA is, and at all times has been, the sole member of Nominal Defendant Premium Holding, LLC ("PH," and together with POA, "Premium"),[5] a Delaware limited liability company governed by a "2011 Limited Liability Company Agreement" (the "PH LLC Agreement").[6]

Defendants Jasen Adams, David Hartcorn, and Brian Tollefson were members of the board of managers of POA (the "POA Board") at the time of the challenged transaction,[7] and also served on the board of managers of PH (the "PH Board") "at

---

[3] The facts are drawn from the Plaintiffs' Second Amended Complaint (the "Complaint") and are presumed true for purposes of evaluating the Defendants' motions to dismiss.
[4] Compl. ¶¶ 1, 6.
[5] *Id.* at ¶ 14.
[6] *Id.* at ¶ 7.
[7] *Id.* at ¶ 1.

3

all relevant times."[8]

*B. Factual Overview*

The following fact recitation will likely strike the reader as inadequate to the questions presented; even so. That inadequacy is an artifact of the complaint, the consequences of which are addressed in this Memorandum Opinion, infra.

1. The Creation of POA

POA was created as a result of proceedings in the U.S. Bankruptcy Court for the District of Columbia concerning two affiliated companies, Beneficial Assurance Ltd. and Premium Escrow Services, Inc. (collectively, "Beneficial").[9] Beneficial was in the business of purchasing insurance policies insuring the lives of critically ill individuals (in this case, those afflicted with HIV/AIDS), and then selling fractional shares of those policies to investors, to create what is known in the insurance industry as "viaticated" or "viatical" life-insurance policies.[10] By the early 2000s, due to advances in the treatment of HIV/AIDS, Beneficial's business model

---

[8] *Id.* at ¶¶ 3–5. However, it is not entirely clear from the Complaint whether the Defendants constituted the *entire* Premium Board at the time of the challenged transaction. As discussed later in this Memorandum Opinion, the Complaint asserts only that the alleged improper transaction by the Defendants occurred sometime between June and October 2013. According to the Complaint, manager Lida Bray left the Premium Board "[s]ome time later" than the "latter part of August 2013." *Id.* at ¶ 31. Thus, Bray may have been on the Premium Board at the time the challenged transaction was approved. *See* Oral Argument Tr. 57:21–58:2 ("Your Honor, I think it's clear from the complaint that the transaction occurred sometime after June 2013 and sometime before October 2013. And the complaint says, *with a possible exception of Bray*, who was on the board at the time the transaction was approved." (emphasis added)).

[9] Compl. ¶ 8.

[10] *Id.*

4

was no longer sustainable, leading it to file for bankruptcy in 2002.[11]  The bankruptcy proceedings culminated in a 2003 "Plan of Reorganization," pursuant to which the insurance policies Beneficial owned were transferred to POA, and Beneficial's creditors became members of POA.[12]  The members of the "Creditors Committee" in the bankruptcy proceedings became the initial POA Board.[13]

When created, POA was intended to be a liquidating entity only.[14]  It held approximately 280 policies, with a face value of approximately $189 million, and a sum of cash.[15]  POA's model was to pay premiums on the policies that had value, collect the proceeds upon the insureds' deaths, and pay distributions to its members from the cash, all while reserving sufficient funds to pay premiums on the remaining policies.[16]  POA anticipated that, through this model, it would return between $100 and $120 million to its members over its first five years.[17]

POA's other substantial asset was a group of choses in action.  POA brought a series of lawsuits asserting claims against several of the agents, including Defendant Hartcorn, who had sold insurance policies to POA members.[18]  Hartcorn

---

[11] *Id.* at ¶ 10.
[12] *Id.*
[13] *Id.*
[14] *Id.* at ¶ 11.
[15] *Id.*
[16] *Id.*
[17] *Id.*
[18] *Id.* at ¶ 12.

5

then hired Defendant Adams to represent him in the litigation.[19] Adams ultimately represented over 100 agents in similar lawsuits, thereby gaining an intimate understanding of POA's business.[20] Ultimately, none of these lawsuits were resolved in favor of POA.

### 2. Save POA Removes Incumbent POA Management

In 2011, Adams and Hartcorn formed Save POA LLC ("Save POA"). Intending to wrest control of POA, Save POA commenced a proxy solicitation seeking appointment of a new slate of directors that had been hand-picked by Save POA.[21] As a defensive measure against Save POA, the POA Board created and transferred all of POA's assets to PH in June 2011.[22] Counsel for the Defendants clarified at oral argument that the PH Board was structured so as to be insulated from the POA Board; the POA Board could not appoint or remove any PH Board members, or otherwise control the actions of PH.[23]

In December 2011, two POA members affiliated with Save POA filed an

---

[19] *Id.*
[20] *Id.*
[21] *Id.* at ¶ 13.
[22] *Id.* at ¶ 14. Although the Complaint is silent as to whether PH subsequently transferred some or all of the assets back to POA, PH presumably still held all of POA's former assets at the time of the challenged transaction. Due to this ambiguity surrounding which entity held the assets, it is likewise unclear whether the POA Board, the PH Board, or both, authorized the challenged transaction. *See id.* at ¶ 1 (The Defendants "appropriated for their personal benefit the assets of POA *and/or* its wholly-owned subsidiary, Premium Holdings, LLC ("PH").") (emphasis added); *see also id.* at 20 (seeking in relief an order "[o]rdering Defendants to return POA's and PH's assets to POA and/or PH").
[23] Oral Argument Tr. 9:13–16.

6

action in this Court seeking, among other things, an order requiring POA to hold an annual meeting of its members (the "Chancery Action").[24] In February 2012, the POA Board sued Save POA in the U.S. District Court for the District of Maryland, alleging that Save POA had violated federal securities law in bringing its proxy solicitation.[25] After the Maryland District Court determined that POA was not subject to federal securities laws, and thus that any proxy solicitation concerning POA could not violate federal securities laws, and after the Fourth Circuit affirmed the ruling in April 2013,[26] this Court entered judgment in the Chancery Action in favor of Save POA.[27]

In May 2013, POA's incumbent management resigned, and the Save POA slate—consisting of Ralph Cyr, James Pannella, Lida Bray, Michael Weber, and Robert Knight—became the new POA Board, with Pannella serving as President.[28] While the complaint does not specifically allege that the incumbent management also resigned from the PH Board, to be replaced by the Save POA slate, it appears this occurred as well.[29] Likewise, it appears that Pannella was appointed President

---

[24] Compl. ¶ 15.
[25] *Id.* at ¶ 17.
[26] *Id.*
[27] *Id.* at ¶ 18; *see Huck v. Premium of Am., LLC*, C.A. No. 7283-VCG (Del. Ch. Apr. 11, 2013) (ORDER).
[28] Compl. ¶ 18.
[29] *See* Oral Argument Tr. 73:15–19 ("[O]ur understanding is that the compositions of the boards were the same throughout, and I think the reasonable inference to be drawn from our complaint is that the composition of the boards was the same throughout.").

7

of both POA and PH.[30]

### 3. Adams, Hartcorn, and Tollefson Seize Control of POA

According to the complaint, at some undefined time after the Save POA slate became the POA Board, Adams and Hartcorn, through "threats and/or persuasion," caused Knight, Weber, and Cyr to "resign from the Board and to be replaced by themselves and Defendant Tollefson."[31]

In June 2013, Adams and Hartcorn informed Pannella that TYRSS, LLC ("TYRSS"), a company in which Adams and Hartcorn allegedly each held an interest,[32] would make an offer to purchase POA or its assets (the "TYRSS Proposal").[33] The TYRSS Proposal called for an aggregate distribution to POA members of approximately $8.75 million in cash and $400,000 in "Board Member Termination Fees" to be paid to POA Board members who voted in favor of the TYRSS Proposal.[34]

Pannella objected to the TYRSS Proposal as undervaluing POA,[35] and to the

---

[30] *See* Compl. ¶ 30 (describing how Adams, Hartcorn, and Tollefson later "signed resolutions purporting to remove Pannella from the Board, although no provision of the Operating *Agreements* permitted such removal") (emphasis added).

[31] *Id.* at ¶ 19. Again, I assume that the Plaintiffs' use of the term "Board" refers to both the PH and POA Boards. *See supra* note 29. It is not entirely clear when these Board replacements occurred. The Complaint alleges only that Tollefson, a close personal friend of Adams, became a "Board member in or about May 2013." Compl. ¶¶ 5, 19. I note that actions are attributed to Cyr as late as June 2013, *id.* at ¶ 29, but that Knight is not mentioned elsewhere in the Complaint.

[32] The Plaintiffs, however, do not believe that TYRSS does, or ever did, exist. Compl. ¶ 23.

[33] *Id.* at ¶ 21.

[34] *Id.* at ¶¶ 21–22.

[35] *Id.* at ¶ 24.

$400,000 Board Member Termination Fees as an apparent bribe to entice POA Board members to vote in favor of the TYRSS Proposal.[36] According to the Plaintiffs, POA held at the time at least $11.6 million in cash, in addition to life insurance policies worth tens of millions of dollars.[37] Therefore, as of June of 2013, the Plaintiffs allege, POA was in a position to "distribute[] a significant portion of its $11.6 million in cash to its members, while retaining funds to pay premiums on policies it still held."[38]

Pannella also worked with POA's then-accountants, Varanko & Black ("V&B"), to estimate that POA could expect to make at least $20 million in distributions to members over ten years, with an additional terminal payment of at least $14 million at the conclusion of business.[39] Cyr agreed with Pannella's assessment and joined him in refusing to support the TYRSS Proposal.[40] Adams, Hartcorn, and Tollefson "rejected these findings," without further investigation or due diligence, and urged Pannella to support the TYRSS Proposal.[41] However, at a June 19, 2013 meeting of POA members, at which Pannella announced to attending

---

[36] *Id.* at ¶ 26.  I note again that the Complaint does not make clear which entity, POA or PH, held the assets.  The allegations surrounding the TYRSS Proposal center on POA, but, presumably, PH still held the assets at this time, and the PH Board would also need to vote in favor of the TYRSS Proposal.  *See supra* note 22.

[37] Compl. ¶ 24.

[38] *Id.* at ¶ 25.

[39] *Id.* at ¶ 27.

[40] *Id.* at ¶ 29.

[41] *Id.* at ¶ 28.

9

members that he would "marshal POA's assets for the current and future benefit of POA and its members," Adams, Hartcorn, and Tollefson did not dissent or raise the TYRSS Proposal.[42] At least as of that time, the TYRSS Proposal was not implemented.

In August 2013, allegedly in retaliation for Pannella's opposition to the TYRSS Proposal, Adams, Hartcorn, and Tollefson "asserted that they had removed Pannella both as President of POA and as Chairman and a member of the Board," and signed resolutions to that effect, "although no provision of the [LLC] Agreements permitted such removal."[43] Cyr resigned from the "Board" in early August 2013.[44] As a result, by the later part of August 2013, Adams, Hartcorn, Tollefson, and Bray constituted the POA and PH Boards.[45] Bray resigned "sometime later" from both boards after—according to the Plaintiffs "[o]n information and belief"—being paid $100,000 at Adams, Hartcorn, and Tollefson's "instigation."[46]

### 4. Adams, Hartcorn, and Tollefson "Apparently" Misappropriate POA's Assets

In mid-October 2013, POA sent its members an undated, unsigned letter on

---

[42] *Id.* at ¶ 29

[43] *Id.* at ¶ 30. While it is not clear from the Complaint—as "Board" is an undefined term— it appears, given the allegation that neither the POA nor the PH LLC Agreement permitted this form of removal, that Pannella was removed from both the PH and POA Boards.

[44] *Id.*

[45] *Id.* at ¶ 31.

[46] *Id.*

10

POA stationary (the "Letter"), which stated, among other things, that POA was making a final distribution of approximately $7 million to its members and winding up operations.[47] Accompanying the Letter, each member received a check from POA purporting to be a final distribution.[48] The Plaintiffs assert, in light of the V&B valuation and POA's alleged $11.5 million of cash on hand,[49] that the Defendants "*apparently implemented some form of the TYRSS Proposal*, distributing a part of POA's cash and taking the remaining assets of POA/PH for themselves."[50] The Plaintiffs assert also, upon information and belief, that Tollefson received a $100,000 payment in return for his support of the proposal,[51] and that the Letter, by stating that POA had obtained "an independent valuation in the range of $3.4 million to $3.8 million" in December 2012, was false and misleading.[52]

The factual recitations in the complaint stop there. The complaint is silent as to the nature of the actual transaction by which the assets were liquidated, the nature of the board action, if any, in way of that transaction, who the other parties to the transaction were, and the current ownership of the assets sold.

*C. Procedural History*

The Plaintiffs filed a complaint on December 10, 2014, and a second amended

---

[47] *Id.* at ¶¶ 33, 40.
[48] *Id.* at ¶ 33.
[49] *Id.* at ¶ 40.
[50] *Id.* at ¶ 33 (emphasis added).
[51] *Id.*
[52] *Id.* at ¶ 34.

11

complaint on August 27, 2015 (the "Complaint"), alleging four counts. Count I assets a derivative claim for breach of fiduciary duties; Count II asserts a derivative claim for breach of the Defendants' express and implied obligations under the POA and PH LLC Agreements; Count III asserts a direct class claim, on behalf of a class of POA members and assignees of POA member interests, other than the Defendants or any person or entity affiliated with the Defendants, for breach of fiduciary duties;[53] and Count IV asserts a class claim for breach of the Defendants' express and implied obligations under the POA LLC Agreement. In relief, the Plaintiffs seek the appointment of a receiver for POA and PH; an order directing the Defendants to return the misappropriated assets; a declaration that Counts III and IV are class claims and certification of Plaintiffs as class representatives; damages; and costs.

The Defendants moved to dismiss the action pursuant to Court of Chancery Rules 23.1 and 12(b)(6). After full briefing, I heard oral argument on the motions on January 12, 2016. This Memorandum Opinion addresses those motions.

## II. ANALYSIS

This matter challenges a transaction (the "Presumed Transaction") by which the Defendants presumably transferred assets of Premium[54] to themselves, or to

---

[53] *Id.* at ¶ 60.

[54] Throughout this section, I refer to POA and PH collectively as "Premium" for the sake of clarity. As discussed above, it is unclear, according to the Complaint, whether the PH and POA Boards were identical at all times, and whether PH still holds all of the assets of POA that were, at one time, transferred to it.

persons or entities related to them or under their control, for a manifestly inadequate price. According to the Complaint, as explained at oral argument, the Presumed Transaction occurred between the time of the TYRSS Proposal, in June 2013, and the mid-October 2013 final distribution of approximately $7 million. The Plaintiffs' theory is that Adams and Hartcorn manipulated the Premium Board membership after the rejection of the TYRSS Proposal, and, with a new and favorable Board composition, were able to act in breach of their fiduciary duties. Both LLC Agreements exculpate certain fiduciary duties; the parties agree, and I accept for purposes of this Memorandum Opinion, that the fiduciary duty applicable to the Presumed Transaction was that the managers would act in good faith. The Plaintiffs argue, and I agree, that a transfer of assets by the Premium Board to individual managers at a manifestly unfair price would not be an action done on behalf of Premium in good faith. The managers at the time of the Presumed Transaction, according to the Plaintiffs "on information and belief," included Adams, Hartcorn, and Tollefson. A non-defendant, Lida Bray, resigned from the Premium Board sometime following the rejection of the TYRSS Proposal, and may or may not have been a Premium Board member at the time of the Presumed Transaction.

As revealed at oral argument, the Defendants—either as a form of "voluntary discovery" or as part of settlement negotiations—provided the Plaintiffs with discovery on the facts leading up to the final distribution. The Defendants contend

13

that those facts are helpful to them, but that they cannot comment on them because they are not alleged in the Complaint; they fault the Plaintiffs for omitting those facts from the Complaint, suggesting that they were not included because they were unhelpful to the Plaintiffs. For their part, the Plaintiffs argue that the facts disclosed to them by the Defendants during the litigation were in aid of settlement; that they had a professional responsibility not to use them in the Complaint or otherwise disclose them; and that, absent this duty, they would have pled these facts (the "Phantom Facts"), which they contend are in fact helpful to the Plaintiffs. The oral argument, therefore, occurred in a fashion reminiscent of Lewis Carroll: the parties argued the sufficiency of the Complaint, which did not disclose the identities of the managers who engaged in the Presumed Transaction, theoretically in breach of their fiduciary duties; and which failed to disclose any facts regarding that transaction, when it occurred, or what individuals or entities now control the insurance assets formally held by Premium, presumably transferred in that transaction. Despite this circumscribed argument, all the parties were in fact in possession of the Phantom Facts; and each hinted that the Phantom Facts were favorable to their side, with only the Court left ignorant. It is in this context that I approach the motions to dismiss.

The Defendants seek to dismiss under Court of Chancery Rule 23.1, arguing that demand was not excused for Counts I and II (the derivative counts), and that Counts III and IV (the direct counts) are in fact derivative under the test announced

by our Supreme Court in *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*[55] The Plaintiffs argue vigorously that the Presumed Transaction has qualities both derivative and direct that may be pursued in this litigation, or that at least I cannot definitely state that no claims are direct based on this record. The latter contention, unfortunately, is indisputably true since, unlike the parties, I am ignorant of the terms of the Presumed Transaction, assuming it occurred. However, because, under the facts pled, the Defendants' additional ground for dismissal—Rule 12(b)(6)—is sufficient, I need not reach the direct/derivative question.[56]

## A. Standard of Review

On a motion to dismiss under Rule 12(b)(6), I must examine the facts pled in the light most favorable to the plaintiff and "draw reasonable inferences in the plaintiff's favor."[57] However, I am "not required to accept every strained interpretation of the allegations proposed by the plaintiff," and need not "accept as true conclusory allegations."[58] Only if, upon such consideration, I find that it is not

---

[55] 845 A.2d 1031 (Del. 2004); *see id.* at 1039 ("[A] court should look to the nature of the wrong and to whom the relief should go. The stockholder's claimed direct injury must be independent of any alleged injury to the corporation. The stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation.").

[56] I assume, however, that a conversion of assets in connection with the liquidation and distribution of what is the LLC equivalent of a liquidating trust states a direct claim against the managers of that LLC.

[57] *In re Gen. Motors S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (citation omitted).

[58] *Id.* (internal quotation and citations omitted).

reasonably conceivable that the plaintiff may prevail will the motion be granted.[59]

*B. The Plaintiffs' Second Amended Complaint Fails to State a Claim*

The facts alleged here are that (1) an entity (TYRSS)—which may or may not have had actually existence—associated with two of the Premium Board members, Adams and Hartcorn, offered to purchase the Premium assets at a price that would result in an aggregate distribution of $8.75 million in June 2013; (2) following the TYRSS Proposal, Premium Board member Pannella worked with Premium's then-accountants to estimate that Premium could distribute $20 million to its members over ten years with an additional terminal payment of approximately $14 million; (3) in October 2013, Premium's Board made a decision to liquidate and distribute the remaining assets of Premium, in the amount of approximately $7 million; (4) the transaction that provided the funds for distribution, "on information and belief," "apparently implemented some form of the TYRSS Proposal,"[60] and presumably benefitted Adams, Hartcorn, and Tollefson; and (5) the transaction was in breach of the duty of good faith imposed on the managers—who included Adams, Hartcorn, Tollefson, and perhaps Bray—by the LLC agreements. This last conclusory allegation regarding the Presumed Transaction, based on the Phantom Facts, is a wholly insufficient ground on which to rest an inference of bad faith on the part of

---

[59] *Id*. (internal quotation and citation omitted).
[60] Compl. ¶ 33.

16

Adams, Hartcorn, and Tollefson, however.

The Plaintiffs lament the professional obligations that prevented them from disclosing the Phantom Facts—disclosed, in their view, as part of settlement negotiations—which disclosure, if permissible, would have allowed them to plead a complaint describing the Presumed Transaction in a way sufficient to state a claim. Unexplained (despite my inquiry at oral argument) is why the Plaintiffs chose not to seek documents under 6 *Del. C.* § 18-305, which would have entitled them, as LLC members, to books and records relating to the Presumed Transaction. It has perhaps grown clichéd to note that plaintiffs should use Section 220[61] and its LLC analog to develop facts for litigation by stockholders or members against fiduciaries, or for derivative litigation on behalf of the entity.[62] Premium functioned much like a liquidating trust, although its LLC form allowed it to proceed over many years to attempt to vindicate the litigation assets, which appeared valuable but ultimately proved worthless. Upon liquidation of such a trust, the fiduciary would be required, on demand, to account to the beneficiaries for the assets subject to trust.[63] It is clear here that equity must provide relief to the members of Premium upon liquidation,

---

[61] 8 *Del. C.* § 220.

[62] *See, e.g.*, *Thermopylae Capital Partners, L.P. v. Simbol, Inc.*, 2016 WL 368170, *17 (Del. Ch. Jan. 29, 2016) (granting dismissal under Rule 12(b)(6) where stockholder plaintiffs drafted a complaint without full recourse to Section 220 and omitted pertinent facts to which they would have been entitled under Section 220).

[63] *See* Ch. Ct. R. 115 ("Upon petition of any party interested in the guardianship or the trust, the court may require a guardian of the property or trustee, whenever or however appointed or named, to file an account.").

sufficient to allow them to assure themselves that the contractual fiduciary duty of good faith to which they are entitled has been complied with. One mechanism for this would be the use of Section 18-305 as a tool to obtain disgorgement of books and records sufficient to this inquiry. Here, for reasons, again, never explained, the Plaintiffs forwent that step. They seek to rely on inferences that are so disconnected from any pled facts that I am unable to vindicate them even on the standard of a motion to dismiss.

All I can infer from the Complaint is that the Premium Board rejected an interested transaction (the TYRSS Proposal), the details of which are not forthcoming, but which appeared to value the Premium assets at an amount greater than that ultimately distributed several months later. The Complaint fails to describe, among other facts, the Presumed Transaction itself, to whom Premium's assets were transferred, the details of that transfer, the liabilities of Premium that were discharged before distribution of the remaining assets, and the liability reserves maintained by Premium. The inference that the Plaintiffs ask me to draw—that, because the Premium Board rejected the TYRSS Proposal in June 2013 (which would have resulted in an aggregate distribution of $8.75 million), because an estimate prepared by Premium's then-accountants estimated a significantly higher value for Premium's assets, and because Premium ultimately distributed only about $7 million following its October 2013 liquidation, therefore assets must have been

18

diverted in bad faith to members of the Board—is unsustainable. The Plaintiffs filed a complaint, an amended complaint, and a second amended complaint in this action, all without alleging sufficient facts to sustain a claim under Rule 12(b)(6).[64] Therefore, the motions to dismiss are granted.

Counsel for the Plaintiffs, perhaps inferring from the tenor of the Court's questions that its Complaint was not viable, suggested three "paths forward" at the close of his argument. First, he suggested that, despite the deficiencies in the pleadings, I could deny the motions to dismiss. I have already rejected that suggestion. Next, he proposed that I dismiss the matter without prejudice—a proceeding that would run afoul of Rule 15(aaa).[65] The third suggested way forward,

---

[64] Presumably because the Plaintiffs are unable to rely on the Phantom Facts, the Complaint simply states in a conclusory fashion that the Plaintiffs converted assets to their own use and that, on information and belief, the Premium Board consisted of at least Adams, Hartcorn, and Tollefson, among many other conclusory or unverified statements. At oral argument, counsel for the Plaintiffs raised an epistemological argument in aid of this manner of pleading. He argued that, with the exception of facts that an affiant has directly perceived, all facts in all complaints are effectively pled on "information and belief." Oral Argument Tr. 81:21–82:7. In other words, there are not strong pleadings and weak pleadings, only weak pleadings that appear strong and weak pleadings that appear weak. In the same vein, I note that even those "facts" that an affiant believes he has directly perceived may be susceptible to the same limitation—see, for example, *In re EZCORP, Inc. Consulting Agreement Derivative Litigation*, 2016 WL 301245, at *40 (Del. Ch. Jan. 25, 2016)—and that under some schools of philosophical thought, even direct perceptions can only be averred on the equivalent of "information and belief," since understanding resulting from perception is necessarily based on inference. *See generally* Bertrand Russell, *Theory of Knowledge*, *in* Encyclopaedia Britannica (13th ed. 1926). However, litigation being a practical rather than a theoretical exercise, I note that a production of documents from Premium describing how it went about liquidating the assets and calculating the distribution would allow a verified complaint consistent with litigants' and counsel's ethical obligations; in other words, to crib the punchline from the old mathematician/engineer/Zeno's paradox joke, the Plaintiffs' understanding of the facts would then be close enough for all practical purposes.

[65] Plaintiffs' counsel points to the unfairness of the Defendants both arguing that the Phantom Facts support their position and failing to relieve him of what he believes is the professional

which Plaintiffs' counsel obviously considers a weary and unnecessarily circuitous path, would involve dismissal of these Plaintiffs, with litigation to resume, if at all, by another plaintiff on behalf of the members of POA; that plaintiff could first pursue a sufficient factual basis, assuming such exists, to plead a complaint adequately identifying the allegedly wrongful transaction. Weary or not, that is the path that remains for the members.

At oral argument, the parties discussed whether laches would bar a theoretical plaintiff from receiving documents under Section 18-305, if such a request were made today. In light of that discussion, I think it is efficient to note the following: There was an attempt by the Defendants to use what they describe as materials produced in "voluntary discovery" as a bludgeon against the Plaintiffs. In that regard, I do not consider those documents to be protected by professional responsibility or courtesy from being used in any future theoretical complaint on behalf of the class. Second, to the extent laches becomes an issue in the maintenance of a theoretical subsequent suit, that issue would necessarily turn on the facts as then

---

obligation not to disclose those facts; he argues that such unfairness requires that I exercise my discretion under Rule 15(aaa) and dismiss the matter *without* prejudice. I find, however, that the purpose of Rule 15(aaa) would be subverted if a plaintiff who failed to use the tools at hand to create a sufficient record to overcome a motion to dismiss could avoid its strictures. I note that the unfairness Plaintiffs' counsel complains of here—that the Defendants are using professional obligations relating to settlement negotiations as both a sword and a shield—is not pertinent to this inquiry, because I have not relied on Defendants' argument that the Phantom Facts must be favorable to the Defendants to reach my decision on the motions to dismiss.

developed. I note, however, that equity strongly supports a review akin to an accounting of the conduct of the managers in liquidating the assets and distributing the proceeds of Premium.

## III. CONCLUSION

For the foregoing reasons, the Defendants' motions to dismiss are GRANTED. An appropriate order accompanies this Memorandum Opinion.

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

THE JOSEPH PENAR FAMILY )
TRUST, by its Trustee, Joseph Penar, )
THE WALDER FAMILY TRUST, by its )
Trustee, Cecile Donnamarie Newkirk, )
ALLEN AND SUE COOPER, )
individually, and THE ALLEN AND )
SUE COOPER TRUST, by its Trustees, )
Allen and Sue Cooper, )
                       )
          Plaintiffs, )
                       )
      v. ) C.A. No. 10441-VCG
                       )
                       )
JASEN ADAMS, DAVID HARTCORN, )
and BRIAN TOLLEFSON, )
                       )
          Defendants, )
                       )
      and )
                       )
PREMIUM OF AMERICA, LLC and )
PREMIUM HOLDING, LLC, )
                       )
          Nominal Defendants. )

## ORDER

AND NOW, this 28th day of April, 2016,

The Court having considered the Defendants' Motions to Dismiss, and for the reasons set forth in the Memorandum Opinion dated April 28, 2016, IT IS HEREBY ORDERED that the Motions to Dismiss are GRANTED.

SO ORDERED:

<u>/s/ Sam Glasscock III</u>

Vice Chancellor